[No. S004725. Dec. 23, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ROYAL KENNETH HAYES, Defendant and Appellant.

1212

1218

**COUNSEL**

Eric S. Multhaup, under appointment by the Supreme Court, Kathy M. Chavez, Tamara P. Holland and Jeanne M. Fahey for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, William G. Prahl and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—On December 3, 1984, a jury in the Santa Cruz County Superior Court convicted appellant Royal Kenneth Hayes of the December 29, 1981, first degree murders (Pen. Code, §§ 187, 189)[1] of Lauren de Laet and Donald MacVicar, and found true a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)) and an allegation that Hayes personally used a firearm during the commission of the murders. (§ 12022.5.) The same jury convicted appellant of the March 9, 1982, false imprisonment (§ 236) of and assault with a deadly weapon (§ 245, subd. (a)) on Deborah Garcia, and of possession of cocaine (Health & Saf. Code, § 11350) on March 10, 1982, the date of his arrest. The jury was unable to agree on the penalty for the murders.

On May 29, 1986, a jury in the Stanislaus County Superior Court, to which county the case had been transferred on a change of venue, returned a penalty verdict of death. The trial court denied appellant's motion for modification of the penalty (§ 190.4) and imposed a judgment of death on August 8, 1986.

This appeal is automatic. (§ 1239.) We shall affirm the judgment in all respects.

I

THE PROSECUTION GUILT PHASE CASE

Briefly summarized, the evidence, insofar as it relates to the murder counts, established that Donald MacVicar and Lauren de Laet were shot by

---

[1]Unless otherwise stated, all statutory references are to the Penal Code.

defendant at a remote location on the Santa Cruz campus of the University of California where shallow holes, in which the victims were to be buried, had been prepared. The victims were lured to the location by defendant to whom MacVicar had given $250,000 for cocaine, which the victims had been led to believe was to be delivered at a house near the site of the killings. The victims were taken individually from the vehicle in which they had been driven to the location. Diane Weller, an accomplice who testified under a grant of immunity, was instructed to remain in the vehicle. The victims were told that each had to be searched before going to the house where delivery of the cocaine was to occur. Deborah Garcia, another prosecution witness, who had prepared the holes and testified under a grant of immunity, was present. Appellant ordered her to search each victim and, as a victim leaned forward against a tree to submit to the search, appellant shot the victim in the back of the head. MacVicar, the first to be taken to the site, was killed by a single shot. De Laet, who was brought to the site after MacVicar had been shot, did not die at once and was shot in the head a second time. Garcia then brought Weller to the scene.

Appellant removed the victims' heads and hands, after which the bodies were placed in the holes, which had to be enlarged. What appellant believed was quicklime that would hasten decomposition was spread over the bodies. The graves were then covered with dirt, brush, and leaves. The severed body parts were placed in plastic bags and left nearby. Appellant, Garcia, and Weller later disposed of the perpetrators' clothes, the guns, and other evidence at other locations.

On February 20, 1982, a mushroom hunter discovered fragments of what was later determined to be de Laet's skull. He marked the location and took the skull fragments to a sheriff's deputy. He returned to the site with two deputies who, while they awaited the coroner, pieced the fragments together and observed a hole that appeared to be the size of a .44- or .45-caliber slug. On the following day, sheriff's deputies and other investigative personnel located more bone fragments, a small amount of hair, a shovel, a kitchen or steak knife, and a green garbage bag near the place at which the bone fragments were found.

MacVicar's body was found on March 10, 1982, de Laet's the next day. Each torso had a white clay-like substance clinging to it. MacVicar's skull was found in the same area by another mushroom hunter on March 18, 1982. An autopsy surgeon later removed a .45-caliber slug from this skull. De Laet's skull was found to have holes from two bullets which were .44- or .45-caliber. Neck and wrist wounds indicated that the heads and hands had been removed with a slicing or chopping instrument like a hatchet, machete, or cleaver. Identity of the victims was confirmed through past X-ray and dental records.

Appellant's involvement became known when Garcia, fearing for her life and the safety of her family, disclosed her participation to her brother-in-law, who arranged for her to meet with an agent of the Federal Bureau of Investigation and local law enforcement officials.

Weller and Garcia, each of whom claimed to have acted under the domination of appellant and to have feared him, testified about their relationship with him and about various drug-related criminal activities in which they and others had participated with appellant over a period of years prior to the murders.

It is necessary to state in greater detail the evidence received during the guilt phase of the trial, although much of it is not relevant to establishing appellant's guilt, because the evidence goes both to the credibility of the chief prosecution witnesses, Weller, an accomplice, and Garcia, whom the jury may have found to be an accomplice, and to whether Garcia was an accomplice as a matter of law. In addition, at the penalty phase the jury was permitted to consider much of this evidence, which reflected criminal activity involving force and violence and both express and implied threats to use force and violence. (§ 190.3.)

## A. Weller's Testimony.

### 1. Events preceding December 29, 1981.

Weller met appellant in Minneapolis in 1977. She became infatuated with him, and he moved into her apartment. Appellant dressed well, had expensive jewelry, and seemed to be a "big spender." He initially told Weller he was a real estate salesman, but spoke about his relationship with the Teamsters Union and the Mafia. At that time Weller believed appellant's money came from connections appellant had with the Mafia. He told her he could have people followed and could make things happen to them. He did not like "snitches" and people who stole from him. Weller felt she would be killed if she did either, but was not afraid of appellant at that time because she did neither.

Appellant and Weller moved to Kailua-Kona on the island of Hawaii late in 1977. He now claimed that he was connected with the "Hawaiian Mafia" where he was a "man of respect." He told Weller that a person should never argue with a "man of respect" and screamed at her if she talked back to him. Appellant used the code name "Penguin." His credit cards bore a "Central States' Properties" logo. He used other persons' names for two telephones and had a post office box registered to "Mr. Church." He told Weller not to

ask questions about his business and said he was having her followed for her own personal safety. She believed appellant because he was aware of things she had done about which she had not told him.

Early in 1979 Weller left appellant's house because appellant required her to report everything she did. Appellant told her again that he was having her followed for her own safety and she saw persons she thought were following her.

In April 1981 appellant was living in a small one-bedroom house across the road from the beach on Alii Drive in Kailua. Deborah Garcia had been living with appellant at that location. Weller first met Garcia at a time when Garcia was living with appellant, sometime before January 1981, and saw her again that month when Garcia was living in the Alii Drive house. One of appellant's telephones was in Garcia's name. Garcia left for the mainland United States in April 1981. Appellant called Weller. He said Garcia had left, told Weller that he was ill and unhappy, and asked her to visit him. At appellant's request, Weller, who was then living in a small trailer on the beach, moved back in with appellant.

When Weller moved back in with appellant, appellant was using cocaine on a regular basis. For two months both Weller and appellant used two to three grams of cocaine daily. They left the house only for necessities. Appellant often spoke "gibberish" and Weller believed he was having a mental breakdown. In the summer of 1981, appellant began to speak of connections with the CIA and continued to talk about connections with the Teamsters Union and the Mafia. He said that "Penguin" was a code name from the CIA, and told her that two of his friends who came to the house during this period and used cocaine with them were CIA agents. He also showed her purportedly secret documents. Appellant, who stayed awake and talked for days during the two-month period of heavy cocaine use, told Weller that the head of the Teamsters Union was to have a physical examination at the hospital and would never leave the hospital. When the official died on the day appellant said he would, Weller was afraid and believed that appellant did have something to do with the Mafia.

At the time they were living on Alii Drive, appellant often used pay phones to make and receive calls, explaining that his own telephone was probably tapped.

Weller began to doubt her own sanity because appellant often accused her of forgetting instructions. He was then receiving and selling cocaine regularly and she helped him "cut" it. Lauren de Laet mailed a package of

cocaine to appellant during the summer of 1981. He hid the cocaine, which may have been a quarter of a pound, in a lava-rock wall in the garden. Appellant told Weller he had met de Laet on the beach during the summer of 1980 when she was living in Hawaii. De Laet wrote cards to appellant and Weller. Weller talked to de Laet often on the telephone when de Laet called to speak to appellant, and, at appellant's direction, Weller wrote to her weekly. Weller did not meet de Laet in person until Christmas Eve, 1981.

In late June or early July 1981 appellant and Weller stopped using cocaine. The decision to do so was appellant's. They both began eating normally and appellant worked out and jogged daily to get back in shape. His mental state did not return to normal, however. He was tense and easily became angry. He continued to speak of the CIA and about his phones being bugged. He spoke of bombs in the cars.

In August 1981, appellant told Weller that he was going to the mainland to spend more time with de Laet, and that he expected de Laet to move in with him in Hawaii. He told Weller to remove items that would clash with de Laet's nonviolent character from the home. He specified a plastic handgun, handcuffs, a knife, and a picture of appellant wearing a bandoleer of bullets. He told Weller she was to live with Tonya Tate, to whom appellant had introduced her. Weller moved out of the Alii Drive house.

Appellant was with de Laet in San Rafael for about a month in August and September 1981, but de Laet did not accompany him on his return to Hawaii. Appellant asked Weller to move back in, stating that de Laet was just a good friend. Appellant brought LSD back with him. Weller and Tate used LSD with appellant once a week at the Alii Drive house. Appellant had become edgy and short-tempered. He struck Weller in the face twice. He told her the importance of "respect" and claimed that because people were afraid of him they would be afraid of her. He said he would tell people that she was capable of killing and that he had taught her to kill and shoot a gun. She never disagreed with appellant in front of anyone because that would be disrespectful. In October 1981 when she told him that his lies about her were not a good idea, he repeatedly struck her, saying she should never disagree with him and threatened to kill her if she told anyone he had struck her. Although appellant's attitude toward Weller had changed from understanding and kindness to violence, she stayed with him because she was afraid to leave. She also thought that appellant needed help because something had happened within him and she could not just leave him.

Appellant flew to California a week before Thanksgiving in 1981. He told Weller he was tired of Hawaii and was going to buy a house and move to

California. Weller was going to Minnesota for Christmas, but appellant asked her to stop in California and meet de Laet.

Weller flew to San Francisco on December 21, 1981. Appellant and MacVicar met her at the airport and the group traveled to the Millbrae Travelodge. At appellant's direction, Weller rented a room for 10 days. While they were at the motel, MacVicar visited and the three ingested cocaine daily. In MacVicar's presence, Weller gave appellant two guns, one of which was a .45-caliber Colt Combat Commander appellant had instructed her to bring from Hawaii. The second gun was a .22-caliber derringer. Appellant had told her that the guns, which had been in the possession of Tommy Pyne in Hawaii, were registered to Garcia. Appellant appeared to like MacVicar, put his arm around MacVicar, and called him his brother. He told Weller that MacVicar was a wonderful person. Appellant did not leave the room during their 10-day stay at the Millbrae Travelodge.

De Laet arrived at the motel with MacVicar on December 24. While MacVicar was away on December 26, appellant became angry with de Laet, accused her of partying with cocaine he had given her, and hit de Laet several times, demanding that she apologize on her knees to Weller, who was a "lady." He also ordered Weller to hit de Laet. Later he put his arms around de Laet, told her she was a good girl, and told her that everything would be all right.

On December 27, 1981, MacVicar brought $160,000 in cash in a black bag to the motel room where he counted it and packaged it for appellant. The money was payment for cocaine. Appellant stated that he thought they had agreed on $250,000. MacVicar replied that he could get the remainder in a day or two. Following appellant's instructions Weller, de Laet, and MacVicar, wearing gloves, washed the money using towels and rubbing alcohol to remove any fingerprints, and then repackaged the money in thousand-dollar packs. By this time it was obvious to Weller that appellant was not pursuing a real estate transaction. Appellant had mentioned going to Santa Cruz and at this point Weller thought she knew what was going to happen to de Laet and MacVicar.

Weller was directed to address packages of the money she had put together. One envelope containing $20,000 was for Deborah Garcia.

After MacVicar left, appellant told Weller that he planned to kill MacVicar and de Laet in Santa Cruz on December 29 and she was to go with him. A friend in Minnesota had a gun and had made a silencer for him. They were to be delivered on the 28th. He had set MacVicar up for $250,000,

promising MacVicar the best cocaine he ever had. MacVicar and de Laet had been led to believe that to make the deal, they had to go to Santa Cruz because people who did not want their names disclosed were going to deal with appellant on their farm in Santa Cruz. The $20,000 for Garcia was for going to Santa Cruz with them. Weller did not go to the police because she did not believe she could stop the killings and feared that appellant would kill her if she did so.

Larry Dahl, a friend of appellant, arrived from Minnesota with a pistol equipped with a silencer on December 28. Minutes before Dahl arrived, Weller had taken a telephone call for "Penguin" from a caller who said: "Tell him it's L.D." Appellant told Weller that Dahl was a "man of respect" whom she was to hug when he entered. Appellant and Dahl embraced, spoke of "old times," and Dahl showed appellant how to attach the silencer and use the gun. The silencer looked like a car muffler and was about a foot long. Dahl stated that Jim Johnson could not guarantee that the silencer would work because appellant had not given him much time to work on it. Appellant hid the gun before MacVicar returned. MacVicar and Weller left to mail the packages of money, except that for Garcia, at different post offices and purchase food. After they returned, MacVicar left to get an ounce of cocaine for appellant. While he was gone, appellant told Weller that he was going to pay Dahl $5,000 for delivering the pistol and silencer. Appellant also offered to pay Dahl's hotel expenses at the San Francisco Airport Hilton.

### 2. December 29, 1981.

On December 29, 1981, appellant told Dahl and Weller to rent a four-door sedan, with Dahl signing as the renter and Weller as the second driver, for the drive to Santa Cruz. He ordered Dahl and Weller to get knit caps, gloves, a saw, and a hatchet. He explained that he was going to cut up the corpses of MacVicar and de Laet so the bodies could not be identified if found. After they had obtained the items and Dahl had left, appellant told Weller to wear gloves and the stocking cap with all of her hair underneath it. She was also told to bring a change of clothes to wear after the killings, to shower, and to avoid use of deodorant or perfume.

Appellant and Weller left the motel at noon on December 29 with the hacksaw and plastic garbage bags in one suitcase, the remainder of the money in a briefcase, the gun with silencer in a second briefcase, and the change of clothes in a second suitcase. All of these items were put in the trunk of the rental car, and the couple drove to the San Francisco Airport Hilton Hotel where they met de Laet and MacVicar in the parking lot. The four then drove to Santa Cruz in the rental car, de Laet at the wheel.

In Santa Cruz, the group met Garcia in the parking lot of a doughnut shop at 3:00 p.m. Appellant had told Garcia earlier that he would say she was a teacher, to put de Laet and MacVicar at ease. Weller was told to refer to Garcia as "Bebe," as de Laet and MacVicar knew Garcia by that name. Leaving the others in the rental car, appellant spoke with Garcia at her Bronco automobile for 10 to 15 minutes. He then told Weller, de Laet, and MacVicar to join Garcia. They would use the Bronco because Garcia knew the way and to avoid getting stuck in the mud as it was raining. Appellant brought the luggage to the Bronco. The five then drove in Garcia's Bronco to a place on Empire Grade Road where Garcia parked on the shoulder. Garcia and appellant walked into the woods adjacent to the road, appellant explaining they were going to "check out" the exact location of the house where the cocaine transaction would occur and to see if they could walk or drive in. Appellant took a suitcase and a briefcase with him.

Garcia returned in about 10 minutes and told MacVicar he could get out, but when de Laet started to follow, Garcia told her that appellant wanted MacVicar to come by himself. Weller and de Laet waited in the Bronco. Before Garcia returned again to the Bronco about 10 minutes later, Weller heard a single gunshot which sounded like a branch breaking. Garcia then told de Laet she could get out and went with de Laet into the woods. After another 10 minutes Garcia again returned and told Weller she could get out. Weller told Garcia she really did not want to, but Garcia said appellant wanted to see her. Weller believed she was going to be killed because she knew what was to happen to the two people ahead of her. When Weller reached appellant, he was holding the gun in his hand and was standing over the bodies of MacVicar and de Laet, each of whom had been shot in the head. Appellant told Weller and Garcia that they were "really good girls," and told them that they were never to discuss the matter with anyone, even themselves, and that he owed it to each of them to kill the other if either did so.

Garcia and Weller were ordered to take the clothing off the bodies and to place the clothing in one of the garbage bags and the victims' jewelry and any metal objects in another with the expended shells. As they were doing so, appellant tried to use the hacksaw to cut off MacVicar's head, but the blade broke. Commenting that "they don't make them like they used to," he then used the hatchet to chop off the heads and hands of both victims. The body parts were placed in a third garbage bag. The women were ordered to place MacVicar's body into the larger of the two holes Garcia had previously dug. The three then placed de Laet's body in the second hole. Each hole had water in it and had to be made deeper. Garcia then opened a bag of lime and poured half of the lime over each body before the holes were

covered. Appellant said the lime would decompose the bodies. The holes were filled with dirt and the area was then covered with leaves and branches so it looked like the rest of the forest area. The three garbage bags were placed by a tree deeper in the woods. The hacksaw and hatchet had been placed in the bag with the metal objects.

Appellant, Weller, and Garcia then drove back to the doughnut shop. The guns Weller brought from Hawaii were in the console of the Bronco with the envelope of money for Garcia. The three changed clothes in the Bronco and put the clothes they had removed into a garbage bag which was placed in the trunk of the rental car. Garcia did not have a second pair of shoes and wanted to keep hers on, but appellant did not allow that. Appellant and Weller then followed Garcia who drove the Bronco to the Dream Inn Motel in Santa Cruz where Weller registered in her name at appellant's direction and paid for the room with money he had given her. She did not report the murders at that time because she was terrified. She believed appellant would kill her if she did so.

On the way to the Dream Inn appellant told Garcia to call Garcia's mother, Mrs. Diane Edwards, and have Edwards join them at the motel. He told Weller that Edwards knew "some old school people" of respect in Las Vegas. She understood this to be a reference to Mafia people. Garcia called her mother, asked her to come over, and asked her to bring shoes for Garcia. Garcia assured appellant that her mother did not know what they had done that day and Weller assured him that no one knew what she had done. He again told them they were never to talk about it, even to him. Garcia's mother then arrived, with the shoes.

Garcia and Weller remained in the Dream Inn room for one or two hours. Appellant was consuming cocaine which he had in one briefcase. Before Garcia's mother arrived at 6:30 p.m., appellant, who had been in the bathroom with Garcia, told Weller that Garcia had lied about whether Garcia had stopped drinking and directed Weller to go into the bathroom and slap her. When she went into the bathroom Garcia was crying and said "I'm sorry." Appellant's treatment of Garcia was similar to his earlier treatment of de Laet. Appellant then went back into the bathroom to talk to Garcia. At 9:00 or 10:00 p.m., appellant said he wanted to be alone with Edwards and directed Weller and Garcia to take a room at another Santa Cruz hotel and return to the Dream Inn the next morning at 9:00 or 9:30 a.m.

Weller and Garcia left. Garcia took the guns out of the Bronco, which belonged to Edwards and put them in a knitting basket in the trunk of Garcia's small sports car which Edwards had driven to the Dream Inn.

Garcia drove the pair, in her car, to a Holiday Inn where Weller again registered in her name and paid for the room with money provided by appellant. Garcia brought the knitting basket with the guns. Weller believed that Garcia was guarding her. She was terrified.

During the evening, Garcia told Weller that she had recently married an armored truck driver and was not taking drugs or drinking anymore.

Weller did not tell the hotel manager or call the police to tell them of the day's events because she was afraid.

 3. *Post-December 29, 1981, California events.*

Weller and Garcia returned to the Dream Inn the morning of December 30, 1981. Edwards opened the door. After two or three hours, the four left the hotel. Garcia drove her own car. Her mother drove the Bronco. Weller drove appellant in the rental car back to the Millbrae Travelodge. The garbage bags of clothing, the suitcases, and the briefcases were all taken into the original room where appellant, using a hunting knife, cut up the soiled clothing, clothing MacVicar and de Laet had brought down for the Santa Cruz visit as well as de Laet's soft luggage bag, and the items used to wrap the money, all which was put into trash bags. Weller was directed to call Dahl from a nearby phone. When Dahl arrived a few hours later, appellant gave him and Weller detailed instructions about disposal of this clothing in various Dumpsters around town using the rental car. He also directed them to purchase ammonia and rubber gloves. Dahl told Weller he did not want any blood leaking from the bags. They completed the tasks and returned in about two hours. Weller called the airport and made a reservation in her own name for a December 31, 1981, flight to Minneapolis.

Sometime before December 29 appellant had told Weller that he had directed de Laet to write a letter to him in Hawaii. The letter was to arrive after her death and cover up her murder, referring to Lauren and Don in Florida having a wonderful time and preparing to leave the country. Weller saw appellant hand a letter, wrapped in tissue to avoid fingerprints, to Dahl on December 31 and heard him ask Dahl to mail the letter from Florida. Using the ammonia and rubber gloves, appellant, Weller, and Dahl cleaned the hotel room to remove any trace of hair or fingerprints. Later that day, Weller drove to the San Francisco Airport Hilton, where Dahl was staying, to return the rental car. Dahl and appellant followed in a rental car Dahl had driven from Minnesota. They stopped on an access road and Dahl joined Weller. After returning the California rental car, Weller and Dahl took a taxi to the waiting Minnesota rental car, and, with appellant, drove to the airport

to drop Weller off for her 1:00 p.m. flight to Minneapolis. Appellant had asked Weller to reserve the room at the Millbrae Travelodge for three more days, but the management would not do so. Appellant said he and Dahl were going to drive up to Washington and that he would fly back to Hawaii from Washington.

Before she left, on appellant's instruction, Weller had called Jim Johnson, whom appellant had often referred to as a friend, and who was to pick her up at the Minneapolis airport. She was told to identify herself as "Big Red." She was to stay with Johnson long enough to tell him how the silencer worked. She made no attempt to notify authorities of the murders after appellant and Dahl dropped her off at the airport or during the two or three stops on the flight to Minneapolis. She was still afraid that appellant would kill her and simply wanted to be away from him.

### 4. *Minnesota events and return to California.*

Jim Johnson's wife, Sondra Johnson, and Sondra's daughter met Weller at the Minneapolis airport at 10:00 p.m. on December 31, 1991, and took Weller to their apartment in Edina. Weller met Johnson, who had just returned from Florida, the next day at another person's home. Later in the day, at the Johnsons' apartment, Weller told him that the silencer did not work the first time, but did work for the second and third rounds. Johnson indicated he knew what she was talking about.

Weller did not go to authorities at this point as she was terrified by appellant's threats to kill her. She believed that the Johnsons were watching her for appellant. When appellant called and asked if she was going to return to Hawaii, she told him she would do so in a month, after seeing relatives. She did not intend to return, but did not tell appellant that, as she feared appellant would come to Minneapolis and kill her. Appellant began calling repeatedly in the middle of the night asking when she was returning, saying that he missed her, and saying he was lonely. She thought he was trying to lure her back in order to kill her.

Dahl appeared a few days after Weller arrived in Minnesota and had a private meeting with Jim Johnson. Weller then saw the Johnsons in possession of a number of guns she recognized as having belonged to appellant, including what appeared to be the gun used to kill de Laet and MacVicar. One gun described to her as a Datonic firearm looked like a gun that had been in California. Appellant had told Weller that Johnson was a cocaine dealer, and Johnson himself told her that he had been to prison, that he dealt drugs, and that he manufactured firearms and firearms parts. He showed her a machine gun.

Weller decided not to go home as she believed appellant was going to kill her and she did not want to present problems to her family. After being with the Johnsons for two weeks, she trusted them more. She became fond of Jim Johnson and a sexual relationship developed between them. This occurred notwithstanding her knowledge that Johnson himself had killed a man and was a cocaine dealer. She believed Johnson could help keep her from being killed. Weller then told Johnson that appellant had gone crazy and had killed two people in a drug setup and that she was certain he would kill her because she was a witness. Johnson seemed surprised and said he thought he had made the silencer for appellant to "kill snitches." He had originally gotten the parts for the gun and silencer from appellant for use in a robbery, but he was later asked to get the gun ready immediately because appellant had to "kill some snitches in California."

Appellant and Garcia arrived at the Minneapolis airport on February 19 or 20. Jim and Sondra Johnson, Weller, and Dahl, all armed because they feared appellant, met them at the airport in the Johnsons' van. Garcia had a black eye. Garcia said a karate opponent caused it.

Garcia was quiet, appeared to be very scared, and throughout her stay was robot-like, doing what appellant told her to do. At the apartment appellant accused Weller of calling him a punk and became angry when she denied the accusation. He demanded that she apologize to Johnson for being disrespectful in his house and ignored Johnson, who protested that Weller was not disrespectful. Appellant followed Weller into the bathroom, grabbed her, slapped her into the tile wall, twisted her arm, and held a comb to her throat as if to slash it. He stopped only when Johnson intervened. Weller finally apologized to Johnson in response to appellant's demands. Appellant then threatened to kill her if she told anyone about the California murders and told her to consider herself "hunted." When she opened a vitamin bottle, clicking off the safety cap, appellant ran toward her, pulled a gun, and pointed it at her. He put the gun down at Johnson's direction.

Appellant and Garcia left the apartment shortly afterwards. Weller did not see them again until the murder prosecution commenced.

Early in March 1982, Weller moved into an apartment with the money supplied by the Johnsons. She did so because she believed Johnson could no longer protect her from appellant. The apartment was rented in the name of Tonya Tate. Johnson stored cocaine and equipment used for cutting, pressing, and packaging the drug, which had previously been kept in Dahl's apartment, in this apartment. Weller remained in the apartment until April 22, 1982, when she surrendered to the Federal Bureau of Investigation (FBI)

in Minneapolis. She did so on the advice of an attorney, although still afraid of being killed by appellant or his associates, after learning that the Johnsons had been arrested, appellant had been arrested, and a warrant had been issued for her arrest. When contacted by Santa Cruz law enforcement officers a day or two later, she refused to talk to them because she was afraid. At the end of June 1982, having been charged with being an accessory to murder, she agreed to talk to them after her Minnesota attorney explained her options and she was promised immunity from prosecution for anything in her statement. The only exceptions to the grant of immunity were perjury and if the prosecutor discovered that she had actually shot someone. Weller agreed to make a statement even though she still feared that appellant would have her killed either in or outside of jail.

Weller first talked to California authorities on June 30 and July 1, 1982, giving taped statements while in the Hennepin County (Minnesota) jail. She had been advised that the charges against her would not be dismissed until she arrived in California. She was returned to Monterey County in protective custody and held in the county jail, first in Santa Cruz and then in Salinas under another name, until August 2, even though the charges against her had been dismissed earlier. The Johnsons pleaded guilty to state and federal charges in Minnesota and Weller did not testify against them, but she did testify against Dahl in Minnesota. For three months she received funds from the California Witness Protection Program during which time she found a job. The Federal Witness Protection Program rejected her request for an identity change.

Weller conceded that she had initially told representatives of the district attorney's office that she did not know that MacVicar and de Laet were going to be killed until the murders occurred. She also testified to that effect at the preliminary hearing and denied that she had seen the hatchet, hacksaw, and garbage bags in the Millbrae Travelodge. Although she had originally denied seeing Dahl in California, because she did not know where he was and was afraid, at the preliminary hearing she testified that she had seen him. On cross-examination at trial she conceded that she had not been truthful in her preliminary hearing testimony when she denied involvement in and knowledge of many of the Johnsons' unlawful activities. The defense also brought out occasions during which Weller was in proximity to law enforcement personnel and could have alerted authorities to the criminal conduct of appellant and the Johnsons, but did not do so, and the many occasions on which there was no impediment to her leaving appellant.

B. *Garcia's Testimony.*

1. *Events before December 29, 1981.*

Deborah (Debbie) Garcia (then Deborah Chichiletti) met appellant in December 1979 in Kailua-Kona, Hawaii. She began dating appellant in or about January 1980. After she had lived for about two months in a house next door to him, appellant asked her to move into his house and assist with household chores. Appellant first told Garcia about the Mafia in January 1980, and stated that a lawyer he helped her retain for her divorce had helped appellant in his Mafia dealings.

Before she moved in with him appellant asked Garcia if she knew anyone who could get large quantities of cocaine. At appellant's request she arranged, through an acquaintance, to purchase one pound of cocaine for $22,000. Appellant supplied the money and she flew to California to complete the purchase. Appellant told her that someone would be watching her on the plane and that she would be killed if anything went wrong. Due to an apparent misunderstanding, the contact had only four ounces of cocaine for which she was charged $2,200 an ounce. When she returned with only four ounces of cocaine, contrary to appellant's instructions, he said he would kill her within the week if she did not make up the difference between what had been paid and what he believed the "crummy cocaine" was worth. She borrowed money from a friend and gave it to him.

From early 1980 to early 1981, while Garcia lived with appellant, he assaulted her at least six times, tried to strangle her, and poisoned her with adulterated cocaine. While she was hospitalized recovering from the poisoning, he hit her in the face during a visit. He said she opened her mouth too much, threatened her with his Mafia connections, and told her she was being watched. She knew the last was true because he knew exactly where she had been even when she had been all alone with no one around. She once thought about leaving and confided in Judith Lindquist, without knowing that Lindquist was appellant's former wife. Soon thereafter, apparently aware Garcia had spoken to Lindquist, appellant told Garcia that he would have Garcia's nephews or nieces killed if she tried to leave, would chop off her brother's head or cut his fingers off, and would hang her sister's child and her brother on meat hooks while forcing Garcia to watch.

After her divorce, appellant had Garcia bring him as many firearms from the marital settlement as possible. She provided appellant with a .45-caliber Colt pistol and a .22-caliber derringer. Appellant buried the guns in an ice chest in the backyard with money and drugs. Later appellant brought home

two Datonic .45-caliber guns. He said they were "good killing guns" and that the guns were not registered; they had come direct from the factory somehow. Appellant had a "cowboy" gun in his bedroom.

Appellant repeatedly threatened to kill Garcia if she did not obey or left without his permission. He claimed to be one of seven "men of respect" in the country. He threatened to kill her family if she committed suicide. After she called a friend and discussed moving out, appellant repeated to her everything she had said on the phone, reminding her that the phone was tapped. He boasted that he was the biggest marijuana grower in Hawaii, and began using cocaine heavily in December 1980, even while he lectured Garcia about taking pills or drinking alcohol. He said she would be killed by the Mafia if she used drugs or alcohol, but later when she lived in his house he let her smoke marijuana with him and take cocaine. Toward the end of 1980, she saw him in possession of as much as a pound of cocaine at the Alii Drive house.

Garcia met Weller in Hawaii in 1980. She first saw appellant using cocaine with Weller and Tonya Tate. Appellant forced her to apologize to his friends for her shortcomings. He also told her under the penalty of death to take care of Bennett Cleff to whom he claimed to be selling real estate under the name "Central States Properties," sending her to a hotel where she engaged in degrading sexual acts with Cleff. She believed she or someone in her family would be killed if she did not comply with Cleff's demands.

Appellant sent Garcia to California in March 1981. During the previous two months he had told her many times that he could or would have her killed. When he sent her back to California he told her he was doing so because the Mafia said she talked too much and had to be killed. He made an agreement with the Mafia to have her watched so she would not talk rather than killed outright.

Appellant gave Garcia a package containing guns and told her to mail them to the mainland to be waiting for her on arrival. She mailed the guns with some of her clothing in a beer cooler provided by appellant. In California she retrieved the package and moved in with her mother as appellant had instructed. Appellant monitored her with frequent phone calls to her and her mother, and told her he had assigned someone to follow her. She never questioned appellant and followed his instructions to wait at phone booths for scheduled calls. Appellant told her she would be followed. She believed him because several times in Santa Cruz she saw a man whom appellant had asked to carry her bag onto the plane in Kona and who had been on the plane to San Francisco. On one occasion, she saw him near her

mother's house. On another he was watching her. Appellant also instructed her to wait at a phone booth each Wednesday at 5:00 p.m. and called her there.

In April 1981 appellant instructed Garcia to open the package of guns, which she had assumed contained her guns. Inside she found instead the Datonic guns and the "cowboy" gun. Appellant directed her to wipe down the weapons with a cloth and store them in the packing until someone arrived at her door using the code name Penguin and asked for the package. When she moved out of her mother's house, appellant directed Garcia to take the package back to her mother's house because Garcia could not be trusted.

In October 1981 appellant visited Garcia and told her to date Donald Garcia, whom she had met earlier and to learn as much as she could about Donald Garcia's employer, an armored car service. He gave her Donald Garcia's Social Security number. In November 1981 appellant ordered Garcia to marry Donald Garcia so that he could more easily arrange to rob Donald Garcia's armored car. She married Donald Garcia on December 5, 1981. Appellant had then developed a relationship with Edwards.

Garcia met de Laet in November 1981. Appellant had then returned to the mainland. At his direction Garcia took the Styrofoam container in which the guns were packed to the Corte Madera Inn in Corte Madera where she met appellant. Garcia drove appellant to the Jack Tar Hotel in San Francisco. He asked her for the keys to the car and they went to the cocktail lounge of the hotel. Appellant left. She remained in the cocktail lounge for about two hours. When appellant returned, the Styrofoam package was no longer in the car. She did not see the container again, but on December 29, 1981, on the university property at the Empire Grade Road, saw one of the Datonic guns it had held. Appellant and Garcia then returned to the Corte Madera Inn. It was late, but appellant was using cocaine and would not let Garcia sleep.

De Laet and MacVicar arrived the next day at 11:00 or 12:00 a.m.. Appellant introduced Garcia as "Bebe," a name he had given her in Hawaii, but did not introduce Garcia to them. At that point she did not know their names. The three used cocaine and appellant told them he could get "some really pure stuff." He ordered Garcia to leave the room while they talked, and when she returned about 30 minutes later, de Laet and MacVicar were gone. She next saw them on December 29, 1981.

Garcia returned to Santa Cruz, but two or three days later, appellant ordered her to come to Millbrae. There he told her that two "snitches" had

been killed, chained together, and dumped in 200 feet of water. Over the next two days in appellant's motel room, he repeatedly showed Garcia her "death card," forced her to her knees, and made her pray to a picture of a man. Garcia again returned to Santa Cruz. Appellant continued to call her at a telephone booth, and in a December 1981 call ordered her to dig two holes in a remote area in which to bury two packages, and to purchase two sacks of quicklime. Because appellant had often buried guns and drugs in Hawaii, she assumed this was the purpose of the holes she was to dig. She dug the holes off Empire Grade Road on University of California at Santa Cruz property on or about December 26 or 27, 1981. She was familiar with the area because she was a member of the California Rescue Dog Association and had worked her search and rescue dogs there in the past. Later, not knowing what quicklime was, she purchased oyster shell gardening lime at a garden shop.[2] Shortly before December 28, appellant called Garcia and directed her to take him to the holes so they could bury the packages. She arranged to meet him at a doughnut shop near Highway 1. He did not give her any instructions regarding what she should wear or tell her not to use deodorants or perfume. He did not tell her that he was bringing anyone with him.

## 2. *December 29-31, 1981.*

Garcia met appellant at the doughnut shop at 3:00 p.m. on December 29, 1981. It was raining. She saw that he had three other people in his car. He came to the car she was driving, her mother's Ford Bronco. Appellant gave Garcia two envelopes. He told her that her guns were in one envelope. The other was money he gave her to help her out because her house was not selling.

Appellant told Garcia that he was going to take the people with him to the place where she had dug holes. He would tell the people that they were going to meet Tony, a Mafia acquaintance, at Tony's secluded shack in the woods and would bury money on Tony's property. He went back to his own car, and returned with Weller and the two people she later learned were de Laet and MacVicar. The group then drove in Garcia's Bronco vehicle to the location at which Garcia had dug the holes, a 15-minute drive.

Appellant told de Laet and MacVicar that he and Garcia would check the site first. Appellant was angry when he found the holes filled with water and accused Garcia of failing to follow his directions. He directed her to bring the man (MacVicar) to the woods to count the money before it was buried. She did so. Appellant had MacVicar lean against a tree for a weapons search

---

[2] Industrial quicklime would have hastened decomposition of the bodies of de Laet and MacVicar.

by Garcia. While she was searching MacVicar, appellant shot him. Garcia did not see him prepare to do that. MacVicar just dropped to the ground and when Garcia turned she saw appellant with a gun with "a long black thing" on the end. Appellant then ordered Garcia to help him drag MacVicar to one of the holes, about 30 feet away. She was "scared to death" and complied.

At appellant's direction, Garcia then returned to the Bronco and brought de Laet back. Asked at trial if she knew at that point what was going to happen to de Laet, Garcia testified that she thought so but did not remember what she was thinking. Appellant shot de Laet while Garcia was performing another weapons search. As de Laet was gasping on the ground, appellant shot her in the head a second time. He then directed Garcia to bring Weller and the two sacks of lime to the site. When Garcia returned appellant directed the two women to dig the holes bigger and deeper, undress the bodies, and put the clothing and jewelry of the victims in one green garbage bag, their clothing in another, and paper things in a third. He was holding what Garcia believed was one of the Datonic firearms in his hand. Garcia thought it was a Datonic because it had a shiny barrel, but conceded that she would not know the difference between a shiny Datonic and a shiny Colt .45-caliber or other kind of gun.

Appellant produced a hacksaw, stating that he was going to remove the heads and hands of the victims to prevent identification. The hacksaw broke. He used a hatchet to complete the task. The body parts were put into a fourth garbage bag, which was left under a bush. Appellant told Garcia to return the next day and hide that bag in a different location. He told Garcia that the heads and hands should not be found in the same area as the bodies. The other three bags were left just inside the barbed wire fence near the road for Garcia to pick up the following day. Garcia was told to burn anything in the bags that was paper, to put paint or something on the clothing before disposing of it so that no one could use it if it were taken from the garbage, and to dump the bag with the metal items into the ocean. Appellant told her she had better take care of this as he was having her followed and her family would be killed if she did not comply.

The bodies were covered with the lime and with dirt. Brush was used to cover the area. These events took between two and three hours. Appellant threatened to kill the women if they talked and threatened to kill Garcia's family if she did not follow his instructions.

Appellant, Weller, and Garcia returned to the doughnut shop, where the rental car had been left. Appellant and Weller changed clothes. Garcia had to take her shoes off. She also took off all of the clothes she was wearing

except her jeans and a top. Her clothes were passed back to Weller, who was in the backseat. At appellant's direction Garcia drove the Bronco to the Dream Inn in Santa Cruz. He and Weller followed in the rental car. Weller was directed to get a room. Garcia was told to call her mother and have her mother bring Garcia a new pair of shoes. The two women dried their hair and cleaned mud and dirt from their fingernails. While the three waited in the hotel room, appellant snorted cocaine and slapped Weller when she tried to take some. He took Garcia into the bathroom where he beat her, accusing her of having champagne on her wedding night and stating that he had warned her that the Mafia would kill her the next time she drank alcohol. He then ordered Garcia to apologize to Weller for drinking champagne. When Garcia's mother arrived, appellant ordered Garcia and Weller to spend the night at a nearby Holiday Inn, saying that Weller was being sent to guard Garcia. They were told to return at 9:00 the next morning. Garcia made no effort to contact police because she was sure Weller would kill her and appellant would have her family killed if she did so.

When Garcia returned the next morning, appellant, still taking cocaine, shut Garcia in the bathroom, beat her, and threatened to kill her brother and her sister's children if she talked. Garcia was confined in the bathroom for hours. During that time she begged her mother to save her brother's life. At 1:00 p.m., all four left the motel.

Garcia drove to the site of the murders, reached through the fence and retrieved the three bags left there. She did not move the bag containing the body parts. She drove to Monterey, rented a room with a fireplace at the Del Monte Hyatt, burned the victims' credit cards, passports, and papers, including the sacks that had held the lime, and, on the following day, threw the metal items, the bullet casings, and the hacksaw into Monterey Bay near Cannery Row. After putting paint on them, she put the victims' clothing in trash bins in a Carmel Valley shopping center. She did everything she was told except take care of the heads and hands.

3. *Subsequent events.*

Garcia did not hear from appellant again until February 16, 1982, when he called her mother and told her to have Garcia call him in Las Vegas. Garcia did so and appellant ordered both women to come immediately to his room at the Riviera Hotel in Las Vegas. He insisted that they come even though Garcia's mother had fallen and broken her ankle. They flew to Las Vegas and joined appellant in his room at the Riviera Hotel where he was taking cocaine and tried to keep the women awake for a day and a half. When she fell asleep appellant beat Garcia until her face was bloody. He told her that

her brother would now be killed and made a telephone call in which he said: "OK, take care of it now." Garcia was then forced to sit outside the room. He took her to the bathroom in the hotel room where he again beat her. Appellant told her that she was to go to Minnesota with him because there was nothing he could do to keep her alive.

Weller, Jim Johnson, Sondra Sellinger (Johnson), and Larry Dahl, whom Garcia had not met before, met the pair at the airport in Minnesota. Garcia had met Jim Johnson in Hawaii. At the Johnsons' apartment, appellant became angry with Garcia and ordered her to apologize on her knees "convict style." He then admitted that Garcia's brother had not been killed, but said it would be easy to do if she talked to the police. Later he became angry with Weller and beat Weller.

Later, appellant had Johnson's nephew drive him and Garcia to a hotel where they stayed for two days. While there, Garcia called her mother, Edwards, who told her a skull had been found near the University of California at Santa Cruz campus. Appellant took the phone and sought details.

Appellant and Garcia flew back to California. Her mother met them outside the Burlingame Hyatt Hotel. Garcia drove home with her mother to Soquel. Appellant telephoned the following morning and ordered Garcia to come to the Peninsula. She met appellant in his Millbrae hotel room where he took drugs, cut pieces of paper, mixed up cards, and told Garcia the queen of spades, the death card, was her card. After two or three days, Garcia returned to Santa Cruz County. Appellant accompanied her, spent a night or more at her mother's home, and then moved to the Holiday Inn in Santa Cruz. When Garcia took her mother to a hospital emergency room because her mother, who had cancer, had developed a blood clot, appellant nonetheless insisted that he needed Garcia immediately as he was having a heart attack. He threatened to kill her brother, father, grandfather, and everyone in her family if she did not come immediately.

On March 9, after her mother had left the hospital, on appellant's order Garcia went to the Holiday Inn. He told her he was a member of the CIA and said that since she talked too much there was nothing he could do to save her. He handcuffed Garcia's right ankle to her left hand and said he would chop off her fingers one at time if she lied while he gave her a lie detector test. He put scissors to her eye and then her vagina, exerting pressure as he did so. He used cocaine, forced her to take cocaine and threatened to hang her upside down and slit her throat if she did not take it. He burned her hair and said she had to be killed. He put pills he said were cyanide in her mouth. He released her after several hours.

Garcia went to the FBI on the following day with her brother-in-law Keith Geiger, attempting to obtain protection for herself and her family. At trial she denied doing so in order to obtain immunity, saying that all she wanted was to obtain protection from appellant for her family and herself. She made several statements regarding the murder case before immunity was offered at the time of the preliminary hearing in 1982. Garcia has since had the marriage to Donald Garcia annulled and has married William Grundherr.

### C. Other Evidence.

#### 1. Diane Edwards.

Garcia's mother, Diane Edwards, was terminally ill and unable to testify at the trial. Her preliminary hearing testimony was read to the jury.[3] That testimony was consistent with Garcia's testimony regarding many of appellant's activities in Santa Cruz and Las Vegas, his threats, domination and abuse of Garcia, his possession of large amounts of money and drugs, and his claims that he was affiliated with the Mafia.

On the night of December 29, Edwards went to appellant's room at the Dream Inn. Garcia had borrowed Edwards's Bronco that day. Garcia called her at 7:00 or 8:00 at night, said she was there with appellant and another woman, and asked Edwards to bring her some shoes. When Edwards arrived at the Dream Inn that night, Weller and Garcia were there. Both had wet hair, but their clothing was not wet. Appellant asked Garcia, "Does your mother know anything?" When Garcia indicated that she had not spoken to her mother, Edwards was asked to wait in the bathroom. She remained there for about 30 minutes. At one point Edwards saw Weller putting large sums of cash away. She saw appellant wiping money with alcohol or water. She also saw a sandwich bag half full of what appellant said was cocaine.

At another time during the evening appellant took Garcia into the bathroom. After some time he came out and told Edwards to straighten Garcia up. Edwards found Garcia in the bathroom with welts on her face, crying. Garcia said she was scared and asked Edwards to help her. Appellant later said that Garcia had problems and he had to keep her in line. Finally he gave Garcia and Weller money and directed them to go and have a good time and to stay somewhere else. Edwards spent the night with appellant. When Garcia and Weller returned the next morning, appellant took Garcia to the bathroom for a "disciplinary talk." Later, in appellant's absence, Garcia said she was scared but could not talk about the problem without involving the rest of the family as there was no safe place to talk because "everything was bugged."

---

[3] Edwards died a day or two after her testimony was read to the jury.

When they checked out of the Dream Inn the following morning, Edwards spent about an hour with Garcia at Garcia's home. Garcia again told Edwards that she was afraid but could not talk to Edwards as someone was listening to everything she said.

Edwards accompanied Garcia to Las Vegas because she did not want Garcia to go alone and Garcia asked her to go with her. Edwards saw appellant using cocaine frequently, and saw him physically abusing Garcia, including threatening her life. Appellant hit Garcia with his fist and his hand. She saw that Garcia's nose was bleeding and an eye was swollen shut. She heard appellant tell Garcia that he would see that her brother was hung from a meat hook and cut up in small pieces if Garcia did not behave.

When Edwards told Garcia (in the telephone call to Minnesota) that a skull had been found on the University of California at Santa Cruz campus and appellant took the phone from Garcia, appellant had expressed an unusual interest in the subject, saying, "What the hell's somebody doing up there hunting mushrooms in the rain?" At appellant's request, Edwards collected newspapers with stories about the skulls and gave them to appellant on his return to California. During the ride home to Soquel with Garcia, Garcia told Edwards that if she talked her family would be killed. While Edwards was hospitalized, appellant visited and threatened Edwards's life.

### 2. *Sondra Johnson.*

At the time she testified, Johnson, then confined in the federal correctional facility in Pleasanton, was serving a federal sentence for a federal firearms violation concurrently with a Minnesota term for conspiracy to commit the unrelated murder of Thomas Carroll. She had agreed in a plea bargain with Minnesota and federal authorities to speak to any authorities who wanted to speak to her and to be open and honest about everything.[4]

Johnson testified, under a grant of immunity, that in the fall of 1981 appellant wrote to Jim Johnson about a planned armed robbery of an armored car. Jim Johnson then tried to buy guns and make silencers for the robbery. He succeeded in making one silencer, but did not complete a second. In early December 1981, after a telephone conversation with appellant, Johnson told her there had been a change in plans and rushed to meet a new deadline for the silencer. Appellant told the Johnsons that he would pay

---

[4]At the time of the plea bargain, she faced a possible life term for murder. The plea bargain was for no more than 67 months in state custody. In the federal proceedings, she had faced four firearms charges, with a maximum term of forty years, as well as charges related to dealing in cocaine.

$5,000 and expenses for someone to drive to California the day after Christmas. Sondra Johnson contacted Dahl and rented a car for him with money later reimbursed by appellant. On December 26, 1981, after receiving a phone call, Dahl left the Johnsons' house. She did not see the gun and the silencer again after he left. Dahl returned on January 4 or 5, 1982. After Dahl returned, Sondra Johnson saw two Datonic .45-caliber weapons that she had not seen before in her apartment. She also saw another gun that Dahl possessed.

Dahl gave Sondra Johnson an envelope addressed to appellant in Hawaii and wrapped in a paper napkin. She mailed that letter from Miami on January 10, 1982. Appellant reimbursed her for the airfare and later thanked her for handling the matter.

Appellant had told Sondra Johnson in mid-December that Weller, whom she knew as "Big Red," would be coming to Minneapolis. Weller called the night before she arrived and told Sondra Johnson the flight number. Sondra met Weller at the Minneapolis airport on December 31, 1981. Weller stayed with the Johnsons until March. When appellant and Garcia arrived on February 19, Garcia had a black eye. Garcia appeared to be totally under appellant's control. Appellant boasted that he had "pulled a fantastic job" in California, and had "killed two people" whose bodies would never be found as they had been chopped up. That night Sondra Johnson saw appellant pull Weller into the hallway bathroom and heard Weller screaming while in the bathroom with appellant.

Two weeks or so after she arrived at the Johnsons' apartment, Weller described the details of the California murders to Sondra and Jim Johnson and admitted having advance knowledge that they would take place. Weller believed appellant would kill her because of what she had witnessed. Everyone in the apartment was afraid of appellant.

3. *Gerda Fox.*

Gerda Fox, a resident of Minneapolis, was a friend of the Johnsons and knew Dale Nelson. She testified, under a grant of immunity, that she, her husband, and the Johnsons had been guests of appellant in a house he provided for them on the beach in Hawaii. She met Garcia at that time. Every four or five weeks she received mail for Jim Johnson at her address. In January 1982 she received a certified package containing money from "Mr. Church" in Hawaii. Sondra Johnson was present and opened the envelope from which she took money. Also in January 1982, in Fox's home, Dale Nelson and Sondra Johnson packed a duffel bag in a box Fox supplied and

sealed the box. Fox was told the item was something they had to get rid of fast. Sondra Johnson left with the package, returned and left the box with her for an hour and then returned again and took the box away. Other evidence established that this box contained a Datonic gun that Johnson tried to dispose of.

D. *Law Enforcement Investigation Evidence.*

Garcia described appellant's false imprisonment of her and the two murders to Special Agent Over of the Santa Cruz Office of the FBI when she and her brother-in-law met with him on March 10, 1982. He notified Santa Cruz County law enforcement personnel. Sheriff's Investigator Henard, who had investigated the discovery of MacVicar's skull on February 20, met Garcia and Geiger at the FBI office the same day. Garcia told him about the murders and led Henard and other officers to the location of the bodies, which were disinterred the following day.

On the same day, Henard participated in the first interrogation of appellant, who had been arrested at the Santa Cruz Holiday Inn after Garcia reported the murders and the assault on her, and retrieved a packet of cocaine appellant discarded in the interview room. Appellant made a taped statement to investigating officers in which he refused to answer questions, was evasive, and claimed to have no knowledge of the murders in which he denied participation. He claimed he was not in California at the time of the murders. At the time of his arrest appellant's blood had traces of Quaaludes. His urine indicated that he had taken cocaine as well as Quaaludes within the previous 24 hours.

A March 11, 1982, search of appellant's hotel room turned up cocaine, $7,020 in cash, and a set of handcuffs. Numerous small snippets of paper were strewn around the room. A March 11, 1982, search of the Johnsons' apartment turned up a box containing a Datonic firearm, a silencer, silencer parts, and a gun barrel. Other firearms and narcotics were also seized. The Datonic Firearms company had no record of the two Datonic firearms, which had consecutive serial numbers. This suggested that the weapons had been taken in an unauthorized manner, such as theft or embezzlement.

Edward Peterson, an agent of the Federal Bureau of Alcohol, Tobacco and Firearms, examined the .45-caliber slug taken from the skull of MacVicar, another slug found nearby, the items in the box seized in the Johnson residence, the two Datonic firearms, a .45-caliber Colt Commander pistol, a .45-caliber barrel with silencer adapter, and two silencers. He testified that the slug taken from MacVicar's skull had the general class characteristics of

the Colt barrel type, but the surface was so abraded as to make comparison to any individual firearm impossible. The other slug was in better condition and also displayed rifling class characteristics of the Colt barrel type. Both silencers had gunshot residue in them. The Datonics and the Colt were in operating condition. Peterson substituted the barrel with the silencer adapter on each of the three firearms, mounted the silencer, and test-fired all three weapons, but could not match the projectiles to any of the three weapons.

## II

### Defense Guilt Phase Case

Appellant did not testify. Several defense witnesses were called to support the defense theory that appellant was not the person who killed MacVicar and de Laet. The defense argued that the testimony of Weller, Garcia, and Sondra Johnson implicating appellant in the murders should not be believed. The idea that MacVicar, an experienced drug dealer, and de Laet went to the Empire Grade site to bury a quarter of a million dollars was incredible. There were parallels between the manner in which Thomas Carroll had been killed by Jim Johnson and the killing of MacVicar and de Laet. Appellant also argued that Garcia was an accomplice whose testimony implicating appellant had to be corroborated and who could not corroborate Weller.

Glen Murta, an acquaintance of MacVicar's, testified that MacVicar was a drug dealer and a gambler. He stopped seeing MacVicar after October 1980 because he owed MacVicar money for a consignment of narcotics.

Warren Pierce testified that de Laet had shared an apartment with Pierce and his wife, Margaret Voss-Pierce. He met appellant when appellant was a houseguest of de Laet. De Laet was a drug user. He also met a man whose first name was "Bennett" who was a narcotics dealer.

John Bradley, a state prisoner who had been convicted of conspiracy to sell cocaine, testified that MacVicar once had been a very good friend. MacVicar had been a large-quantity dope dealer who associated with Bennett Cleff, another large narcotics supplier. MacVicar also had two San Francisco businesses—New Wave Graphics, which put graphic designs on postcards, stationery, T-shirts and sweatshirts, and Party Dog, a party facilitator, which rented party favors and novelties.

Gary Rochelle, a former roommate of Donald Garcia, testified that Garcia and Donald Garcia had a boyfriend-girlfriend relationship for three or four months before they married. They appeared to have a loving relationship.

James Perlin, an acquaintance of Garcia who visited her in Hawaii in 1980, testified that Garcia appeared to be in a loving relationship with appellant.

Garcia's new husband, William Grundherr, testified that he met Garcia at a dog training class in May 1981 and saw her on two later occasions at training classes for the California Rescue Dog Association. She never mentioned appellant until appellant's arrest. In November 1981, while working his dogs, Grundherr saw Garcia near the Empire Grade Road site (from which the victims were taken into the woods and shot). Later he was working his dogs on the University of California at Santa Cruz campus when he saw sheriff's deputies searching for bodies. He identified himself as a member of the rescue dog association and as a reserve deputy and offered to help. His presence at the scene was a coincidence. Officers who were at the scene testified that Grundherr assisted them and that dog handlers were never left alone.

A pathologist testified that he exhumed the body of Thomas Carroll on an island in the Mississippi River south of St. Paul, Minnesota. Carroll died from five gunshot wounds to the head and back, four of which were to the face. Blunt injuries to the skull, possibly to disfigure it and prevent identification, had been inflicted after death. The face and shoulder were covered with hydrated lime, which is not caustic and helped to preserve the body.

### III

#### GUILT PHASE ISSUES

Appellant seeks reversal of the judgment of conviction of murder on nine grounds. He does not challenge the convictions of false imprisonment, assault with a deadly weapon, or possession of cocaine. In each assignment of error appellant asserts that he was denied a fair trial and/or due process as a result of the challenged trial court rulings. We address his claims in the order of presentation.

#### A. *Change of Venue.*

Appellant moved for change of venue at the time of his arraignment in the superior court. The motion was based on the extensive countywide publicity in the print media, radio, and television regarding the discovery of the victims' remains, the arrest of appellant, and subsequent events. Appellant noted that the media had disclosed highly prejudicial information which would not be admissible at trial, including the fact that appellant had been

acquitted of a prior Oregon homicide on grounds of insanity, that he had been acquitted of a murder charge in Minnesota, and that the chief prosecution witnesses had passed lie detector tests. The trial court agreed that if trial were to commence at the time of the motion, a change of venue would be appropriate. The court nonetheless denied the motion without prejudice to renewal closer to the time of trial, stating that as time went by there was less likelihood that appellant could not receive a fair trial in Santa Cruz County.

The motion was renewed 18 months later after almost 3 weeks of voir dire of prospective jurors. Two months after that, appellant supplemented the motion with additional supporting materials reflecting current publicity about jury selection, commencement of the trial, and appellant's then recent marriage. The motion was denied the day before trial began. In denying the motion the court commented that while there had been exposure to pretrial publicity, the exposure was less than the court anticipated, many prospective jurors knew nothing about the case, and the court had passed the selected jurors for cause because the judge was satisfied that the jurors selected would be fair. Those who had been exposed to pretrial publicity recalled very little about the case, would disregard the publicity, and had not formed opinions as to appellant's guilt or innocence.

■ A trial court must order a change of venue for trial of a criminal case to another county on motion of the defendant "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be held in the county." (§ 1033, subd. (a).) The defendant bears the burden of proof that the jurors chosen have such fixed opinions that they cannot be impartial. (*People* v. *Sanders* (1995) 11 Cal.4th 475, 505 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

In determining whether it is reasonably likely that, because of pretrial publicity, a fair trial cannot be held in the county, the trial court will consider, in addition to the nature and extent of the publicity, the nature and gravity of the offense, the size of the community, and the status of the defendant and the victim in the community. (*People* v. *Pride* (1992) 3 Cal.4th 195, 224 [10 Cal.Rptr.2d 636, 833 P.2d 643].) On appeal the appellant must demonstrate that the ruling was error because it was reasonably likely that a fair trial could not be had and that the error was prejudicial because a fair trial was in fact denied. The reviewing court independently reviews the record and must sustain the trial court's determination of ultimate fact if that determination is supported by substantial evidence. (*People* v. *Hart* (1999) 20 Cal.4th 546, 598 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

■ Having undertaken that review, we are satisfied that substantial evidence supports the ruling of the trial court. The population of Santa Cruz

County was under 200,000 at the time of the trial, but the jury was selected from both rural and urban areas of Santa Cruz County, and many prospective jurors did not subscribe to the Santa Cruz newspaper which had the heaviest coverage of events related to the murders. Several prospective jurors had moved to the county after the murders and many others had no recollection of reading about or seeing television news coverage about them. Few prospective jurors who did recall the initial publicity remembered anything other than the fact that the bodies had been found on the campus of the university. Few were aware from media reports of the potentially prejudicial and inadmissible evidence regarding appellant's acquittal of the prior Minnesota murder charge or of the not guilty by reason of insanity verdict in the prior Oregon prosecution. The record fails to support appellant's assertion that the judge was influenced by the cost to the county of a change of venue and that the jury pool was necessarily tainted by the cost of the trial to the county because three other high-profile murder cases had been transferred to other counties for trial. When the initial motion was denied without prejudice, the judge indicated that were he satisfied that a fair trial could not be held in Santa Cruz County, he would grant the motion notwithstanding the cost to the county. And the voir dire of prospective jurors did not suggest that any seated juror had any knowledge of or had considered the cost to the county of trying appellant, let alone any bias arising from such cost. That one prospective juror believed that calling hundreds of prospective jurors from whom to select only twelve was a waste of their time and taxpayers' money does not support appellant's premise.

While the offenses were serious, that factor is not dispositive (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1167 [5 Cal.Rptr.2d 268, 824 P.2d 1315]), and the print and television media articles were factual, not inflammatory. There was no sensationalism beyond reporting the fact that the heads and hands had been removed from the bodies. Much of the publicity occurred almost three years before jury selection began in August 1984. Passage of time since the initial, heavy publicity weighs against a change of venue. (*People* v. *Pride, supra,* 3 Cal.4th at p. 225.) Appellant and the victims were strangers to the community. Thus the press coverage was much more sporadic than is often the case when the victim is a prominent local resident.

The trial court did not err in denying the motion for change of venue. Neither the publicity nor the small size of the community was reasonably likely to, and neither did, result in a jury pool from which appellant could not select a number of jurors unaffected by the publicity. He did not

challenge for cause any of the jurors who sat at the guilt phase.[5] At the time the motion for change of venue was denied, appellant had not carried his burden of demonstrating that it was reasonably likely that a fair trial could not be had in Santa Cruz County. Moreover, as discussed in more detail below, the record does not establish prejudicial juror exposure to publicity either before or during trial.

### B. *Jury Misconduct.*

After the Santa Cruz County jury was unable to reach a penalty verdict and a mistrial had been declared as to the penalty phase, appellant moved for a new trial asserting that Juror Nancy C. Wynn had admitted to defense counsel, to his investigator, and to the guilt phase prosecutor that Wynn had read a newspaper article about the trial that included highly prejudicial information that the court had ruled was inadmissible. Wynn had also claimed that other jurors disobeyed the court's admonition and had learned of this information from the media.

Appellant asserts that the trial court erred in failing to inquire further into allegations of juror misconduct—violation of the court's repeated admonitions that jurors not read or listen to news accounts of the trial during the guilt phase trial. He contends further that the court erred in denying his motion for a new trial predicated on that misconduct in that the misconduct was inherently prejudicial, requiring reversal of the judgment. We do not agree. There was no abuse of discretion. Appellant failed to present substantial competent evidence of jury misconduct in support of the motion for new trial, either with the motion itself or at the hearing on the motion. He offered only hearsay declarations in the papers supporting the new trial motion and, when the court ruled at the hearing on the new trial motion that evidence of the content of Wynn's out-of-court statements was inadmissible hearsay, did not seek to present any additional evidence.

We therefore reject any suggestion that the trial judge may have believed that he lacked authority to conduct an evidentiary hearing and that we should remand the case to the trial court to permit the court to exercise its discretion. The state of the law at the time did not clearly prohibit calling a juror who had refused to execute an affidavit regarding misconduct to testify at an evidentiary hearing, and nothing the judge said suggests that he believed he could not hold such a hearing. Moreover, the record suggests that the judge

---

[5]That appellant was satisfied that the jurors selected were not affected by the publicity is further indicated by appellant's exercise of only 13 of the 26 peremptory challenges allotted to the defense. (*People v. Price* (1991) 1 Cal.4th 324, 393 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Daniels* (1991) 52 Cal.3d 815, 853-854 [277 Cal.Rptr. 122, 802 P.2d 906].)

had no reason to even consider ordering an evidentiary hearing because appellant initially submitted the juror misconduct issue on the record made in the moving papers, did not attempt to call Juror Wynn, did not ask for a separate evidentiary hearing, and never sought to present evidence other than, possibly, testimony by defense counsel and his investigator about the content of Wynn's out-of-court statements to them.

### 1. Misconduct Allegations.

Appellant's new trial motion alleged that news accounts during the trial frequently referred to appellant's prior history and in particular to his acquittals in two prior murder trials and to his incarceration at Leavenworth federal penitentiary. Appellant also asserted in the motion that, during interviews with defense counsel and his investigator, Juror Nancy Wynn had admitted reading such news accounts and learning from them about appellant's criminal record, had stated that she became aware from statements they made that Juror Norlene Hawley was aware that appellant had "murdered" before and had "met Jim Johnson at Leavenworth," and had said that other jurors also knew about appellant's criminal history. He also asserted that Wynn had stated that eventual Jury Foreman Harvey Solomon had made statements indicating violation of the court order that jurors not discuss the case with persons outside the court proceedings, and had made statements which indicated that he had formed an opinion as to guilt before all of the evidence had been presented.

The motion for new trial was supported by written statements from defense counsel and the investigator, neither of which was executed under penalty of perjury. Jon C. Minsloff stated: On February 25, 1985, after a mistrial had been declared, Investigator Kevin Love interviewed Wynn. The information she disclosed led to a second interview by Minsloff and Love on March 5, 1985, at which time Wynn stated that she had read news stories in the Santa Cruz Sentinel during the trial, as "It was too tempting not to want to read about the case." As a result she was familiar with appellant's prior criminal record, including his two previous trials for murder. It was apparent to Wynn that Hawley was reading the same articles because of the timing of the articles and Hawley's comment during guilt phase deliberations that appellant met Johnson at Leavenworth, that appellant had "done it twice before" and "[t]his isn't the first time he's done it." Wynn believed that most jurors had been reading newspaper accounts of the trial during the trial. Wynn always saw Juror Ed Wagner carrying a copy of the San Jose Mercury during the trial and his comments during deliberations made her sure he was reading about the case. Both Wagner and Juror Clarence Hedrick stated during the penalty phase that "We've got to stop him now. We can't let him

get away with it again." Foreman Solomon had acquired the nickname "Hang 'em High Harvey" from fellow teachers at school as a result of discussions about the case (on Fridays when the court was not in session).

Minsloff also stated that he met with Madeleine Boriss (the deputy district attorney who prosecuted the Santa Cruz County proceedings) on September 12, 1985, and advised her of this information. Boriss told Minsloff that she had also interviewed Wynn and Wynn had related the same information about jury misconduct to Boriss. On September 17, 1985, Minsloff gave all of the information to District Attorney Arthur Danner III in a meeting at Danner's office. In October 1985, Deputy District Attorney Jon E. Hopkins (who prosecuted the Stanislaus County proceedings) and Investigator Dennis Clark met with Wynn in her home. On October 31, 1985, when Minsloff and Love again met with Wynn, Wynn said that under no circumstances would she submit an affidavit regarding the matters she had discussed.

Investigator Love stated that when he interviewed Wynn on February 21, 1985, Wynn said that on February 15, 1985, Deputy District Attorney Boriss had told her that Love would probably try to get her to sign an affidavit. When asked why Boriss thought that would happen, Wynn told Love that it was because of the conduct of the jury during the trial and Wynn believed several jurors had read newspaper accounts during the trial. Love described the March 5, 1985, and October 31, 1985, interviews with Wynn, much as Minsloff did. His statement asserted that Boriss and Deputy District Attorney Joyce E. Angell had been present during the September 17, 1985, meeting with District Attorney Danner, and that Boriss had said during the meeting that Wynn had admitted to Boriss that Wynn read newspaper articles about the case during the trial.

The People submitted affidavits by Juror Ida C. Murray that she avoided all publicity during the trial and never saw or heard anyone refer to publicity about the case or mention any matter about appellant that was not presented in the courtroom. She was present when, after the trial, information about appellant's prior difficulties with the law in Oregon and Minnesota, information that had not been presented at trial, was revealed to the jurors. She had not heard these matters discussed by any juror during the pendency of the case and the other jurors who were present when it was revealed expressed surprise. Foreman Solomon was never referred to by other jurors as "Hang 'em High Harvey." Juror Wynn never made any statement in or out of the courtroom indicating any knowledge of the case or appellant's background not presented in court and because Wynn spent courtroom breaks by herself, Wynn would not have been as able to comment on extra-deliberation conversation as well as Murray.

A declaration by Assistant District Attorney Hopkins stated that in a September 26, 1985, interview with Juror Wynn at which Investigator Clark was present, Wynn stated that she had not read any articles regarding appellant during the trial. She assumed that other jurors had done so because "they all stuck together and the men were all so 'macho.'" Juror Bonnie Brofft stated in her declaration that she never heard any juror in or out of court during the trial or during jury deliberations make any reference to publicity or to any information about the case not presented at trial. Jurors commented almost daily that they felt "out of touch" from not reading newspapers or watching TV news. She never heard the term "Hang 'em High Harvey" used during the pendency of the trial.

The trial court denied the new trial motion, ruling that the evidence offered to establish misconduct was inadmissible hearsay.

### 2. Adequacy of Appellant's Showing.

A new trial may be granted when a jury receives any evidence out of court other than a view of the scene or if the jury has engaged in misconduct which has prevented fair and due consideration of the case. (§ 1181, subds. 2 & 3.)

When allegations of juror misconduct made in a criminal trial raise a presumption of prejudice, the court is not limited, as it would be in a civil case, to consideration of evidence presented by affidavit or declaration to resolve whether a new trial motion should be granted. The court may conduct an evidentiary hearing, at which jurors may testify, to determine the truth of the allegations if the court concludes this is necessary to resolve material, disputed issues of fact. (*People* v. *Hedgecock* (1990) 51 Cal.3d 395, 414-419 [272 Cal.Rptr. 803, 795 P.2d 1260] (*Hedgecock*).) "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

When a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary'" to resolve the matter. (*Hedgecock*, *supra*, 51 Cal.3d at p. 417.) It must do so, however, only when the defense comes forward with evidence that demonstrates a "strong possibility" of prejudicial misconduct. (*Id.* at p. 419.)

 Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct. A similar claim was made in *People* v. *Cox* (1991) 53 Cal.3d 618 [280 Cal.Rptr. 692, 809 P.2d 351], where the appellant had offered to submit both the unsworn statement of a juror and a defense investigator's affidavit recounting the juror's statement to the investigator regarding alleged juror misconduct. We found no abuse of discretion in the trial court's denial of the new trial motion without a hearing, noting that the court was justified in according little, if any, credence to the assertions the juror would not verify. (*Id.* at pp. 697-698; see also *Hedgecock, supra,* 51 Cal.3d at p. 419; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1318-1319 [248 Cal.Rptr. 834, 756 P.2d 221].)

Here, in contrast to *People* v. *Cox, supra,* 53 Cal.3d 618, the only evidence offered in support of the juror misconduct claim were the statements of Minsloff and Love regarding out-of-court statements by Juror Wynn. No statement, sworn or unsworn, of Juror Wynn herself was offered. The court had before it competent evidence that the misconduct Wynn assertedly recounted to defense counsel and his investigator did not occur. ██ ██ In these circumstances, the court did not abuse its discretion in denying the new trial motion without further inquiry into the claim of jury misconduct.[6]

### 3. *Failure to Conduct Evidentiary Hearing.*

 We find no abuse of discretion in failing to conduct an evidentiary hearing. Defense counsel offered nothing to suggest that further inquiry by the court into the misconduct claim would have been productive. In his written reply to the People's opposition to the new trial motion, appellant conceded that information in the statements of defense counsel and the investigator was inadmissible hearsay that would be excluded on objection by the People. He stated that counsel and the investigator would testify, thereby answering the "technical" objection. He argues now that he thereby indicated an intent to offer evidence at the hearing on the new trial motion. Minsloff and Love could have testified only that they had interviewed Wynn and she had made statements to them. That testimony would not establish misconduct.

When the matter was heard, moreover, defense counsel did not seek to testify or to call his investigator to testify. In fact that would have been

---

[6]Appellant infers from the sequence of events involving Wynn that the prosecution was responsible for her refusal to execute an affidavit regarding jury misconduct. When a juror's unwillingness to do so is the result of impermissible interference by the prosecutor, an unsworn statement or a declaration reciting the hearsay statement of the juror may be sufficient to warrant a hearing at which the juror may be questioned. (See *People* v. *Cox, supra,* 53 Cal.3d at pp. 698-699.) The record fails to establish such impermissible interference, however.

unnecessary as there was no dispute that Juror Wynn had made statements to Minsloff and Love. All, including the trial judge, recognized that the credibility of Wynn, not counsel or the investigator, was in issue. The issue was not whether the statements of Minsloff and Love were hearsay, but whether evidence of the content of Wynn's out-of-court statements would be admissible. ██ The court excluded evidence of the content of the statements as hearsay, thereby impliedly ruling that the hearsay exception for statements against penal interest (Evid. Code, § 1230),[7] which appellant had argued was applicable, did not apply.[8]

 We cannot agree with Justice Mosk that the court had before it "evidence" of juror misconduct or that the People, through an adoptive admission or judicial admission, conceded as much. Apart from inadmissible hearsay that Juror Wynn assertedly repudiated and refused to verify, the court did not have before it "evidence demonstrating a strong possibility of prejudicial juror misconduct," as the dissent contends. (Dis. opn., *post*, at pp. 1293, 1295, 1296.) We do indeed distinguish hearsay assertions in the declarations of Minsloff and Love from the declarations submitted by the People that denied Wynn's claims of misconduct by other jurors. The declarant jurors themselves executed the latter. Wynn refused to sign any declaration, and the double hearsay recitation of Minsloff and Love regarding Borriss's statement regarding Wynn's statement had even less evidentiary value. Indeed, the People disputed the accuracy of the statement attributed to Boriss and offered to obtain a declaration from her about that assertion.

Clearly there was no adoptive admission of Wynn's alleged statement regarding her own and other jurors' conduct. The hearsay rule does not bar evidence offered against a party who has admitted the *truth* of the hearsay statement. "Evidence of a statement offered against a party is not made

---

[7]Evidence Code section 1230: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." For purposes of this argument, defense counsel assumed that Wynn would be unavailable either because she could not be called and forced to testify or because she would invoke her Fifth Amendment right against self-incrimination. (Evid. Code, § 240, subd. (a)(1).)

[8]The trustworthiness of a statement against penal interest lies in the assumption that the declaration is so contrary to the declarant's penal interest that the statement would not be made by a reasonable person unless true. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1252 [270 Cal.Rptr. 451, 792 P.2d 251].) The prosecutor argued that the record did not make it evident that Wynn was on notice that her statements would constitute misconduct. We agree. Nothing in the record suggests that when she made her statements to defense counsel and the investigator Wynn was aware that violating the court's admonition was misconduct, let alone a serious offense, either as a contempt or a misdemeanor violation of a court order. There was no abuse of discretion, therefore, in ruling that the exception did not apply.

inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct *manifested his adoption or his belief in its truth.*" (Evid. Code, § 1221, italics added.) Even assuming that this adoptive admission exception to the hearsay rule is applicable in these circumstances, although we find no authority supporting invocation of the rule against the People in a criminal case, at no time did the People adopt the statements Wynn made to Minsloff and Love or manifest a belief in their truth. Quite the contrary, they offered evidence to demonstrate that those statements were untrue. ■ "[T]he mere recital or description of another's statement does not necessarily constitute an adoption of it: '[A] statement describing another's declaration is normally not regarded as an admission of the fact asserted by the other. One does not admit everything he recounts or describes merely by reason of the relating of it.' (*Estate of Gaines* [(1940)] 15 Cal.2d [255,] 262 [100 P.2d 1055].)" (1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 650, p. 636.)

■ Wynn's hearsay statements to Minsloff and Love did not come within any exception to the hearsay rule. The People did not concede that the content of the hearsay statements was evidence of misconduct sufficient to warrant further inquiry by the court. They contended that the statements were inadmissible hearsay and were insufficient to justify any further inquiry.

Nor was there a judicial admission by the People that resolved the issue of whether Wynn had admitted misconduct. At most the People acknowledged that Wynn had made contradictory statements to representatives of appellant and the People. Contrary to the view of the dissent, that acknowledgement did not constitute a judicial admission removing the issue of whether juror misconduct occurred from the case. There was no concession or stipulation to that effect, and thus no " 'conclusive concession of the truth of a matter which has the effect of removing it from the issues,' " as was the case in *Smith* v. *Walter E. Heller & Co.* (1978) 82 Cal.App.3d 259 [147 Cal.Rptr. 1], on which the dissent relies. There the party in pleadings and elsewhere on the record had conceded specific facts that resolved an issue in the case. The trial court did not abuse its discretion in declining to consider the content of the conflicting statements allegedly made by Juror Wynn in deciding whether to conduct further inquiry into the appellant's assertion of juror misconduct.

In sum, notwithstanding the assertion of the dissent that appellant offered to present facts within the personal knowledge of Minsloff and Love, the court did not err. The facts to which Minsloff and Love could have testified were only that they had spoken to Wynn and that she had made statements

to them. Testimony to that effect would have been irrelevant to any issue at a hearing on juror misconduct and undoubtedly explains the decision of defense counsel to submit the matter on the papers on file.

It has also been suggested that because the court may not have understood that it had the authority to conduct an evidentiary hearing, we should remand this case to permit the court to decide whether a hearing should be held.

We reject any suggestion that the court abused its discretion in failing to hold an evidentiary hearing or that the court may not have realized that it had discretion to hold an evidentiary hearing at which Juror Wynn could be called to testify. Whether an evidentiary hearing should be held never arose. The court ruled that evidence of the content of Wynn's out-of-court statements was inadmissible hearsay.[9] The defense made no attempt to call Wynn at the hearing on the new trial motion, did not ask for a ruling on whether that would be permitted, and did not seek a further hearing. No offer of proof was made. No admissible evidence was proffered. In the end, counsel did just what he had done "initially." He submitted the matter on the moving papers, adding only additional oral argument.

The record does not support a conclusion that the trial court failed to order an evidentiary hearing because the judge believed in this pre-*Hedgecock* trial that the court was bound by the then recent holding in *People* v. *Scott* (1982) 129 Cal.App.3d 301, 308-309 [180 Cal.Rptr. 891]. *Scott* held that jurors could not be questioned at an evidentiary hearing about matters as to which the jurors had refused to execute affidavits. The prosecutor made a statement at the hearing that may have reflected his belief that *People* v. *Scott, supra,* 129 Cal.App.3d 301, governed.[10] However, as the *Scott* dissent had pointed out, there was contrary authority, and appellant's counsel had asserted earlier in his moving papers that the case law was in conflict as to whether a defendant could compel a juror to testify at a hearing. Appellant had stated

---

[9] The court ruled: "In my view, the evidence which you offer here to show misconduct on the part of the juror, Miss Wynn, is not admissible content evidence and that is because of the hearsay rule, and I don't find any applicable exceptions to the hearsay rule." The ruling refutes appellant's claim that the court ruled only that the declarations were inadmissible and did not consider whether counsel and the investigator should be allowed to testify about what Wynn said. It ruled that evidence of the "content" of the declarations, i.e., evidence that Wynn had said she read newspaper articles about the trial and the defendant's past, was inadmissible hearsay.

[10] In arguing that appellant had not met his burden since the statements offered were hearsay, the prosecutor stated: "I think it would be a totally different matter if we were entitled to bring a juror and put them on the stand and I agree with the rationale that we can't, but if we actually had someone in front of us and the Court had an opportunity to evaluate their credibility and demeanor, whether misconduct had actually occurred, it would be a different matter."

in his moving papers that he had not subpoenaed Juror Wynn "out of respect and consideration." Although he also stated that, if the court ruled that she was not immune, a subpoena would be issued, he did not bring the matter up again, and later submitted the new trial motion on the papers supporting and opposing the motion.

In suggesting that the trial court should have realized that appellant still expected a ruling on his right to call Juror Wynn as a witness at the hearing on his motion for new trial, the dissent expects too much from the court. As noted above, at the outset of the hearing on the motion for new trial appellant stated that he would submit the matter, i.e., the motion, on the moving papers. The court was entitled to accept that submission for just what it appeared to be—a stipulation that appellant's entitlement to a new trial would be decided on the basis of the moving papers. The moving papers were the motion, points and authorities, and supporting declarations and the People's opposition and their supporting declarations. That in those papers appellant may have "implicitly" asked for a ruling on whether he could call Juror Wynn as a witness at an evidentiary hearing does not detract from the incontrovertible fact that when the hearing on the motion was held, he abandoned any implicit or even express request for a ruling on whether Wynn could be called when he submitted the matter on the moving papers. If appellant nonetheless wanted an evidentiary hearing and the right to call Wynn as a witness it was incumbent on him to make that clear. The trial judge was entitled to take him at his word—the matter was submitted on the papers alone.

After a brief argument, during which the possibility of Wynn's testifying was not mentioned, the court ruled that evidence of the content of Wynn's statements was inadmissible hearsay as to which no exception applied and denied the new trial motion. Thus, there is no basis on this record for an inference that the trial court failed to order an evidentiary hearing because the judge believed he could not do so. The court's ruling was based only on the hearsay nature of the statements offered by defense counsel. Since defense counsel did not subpoena Wynn, abandoned the request for a ruling on his right to do so, did not request a further evidentiary hearing or indicate that any admissible evidence would be offered at such a hearing, and, in the end simply submitted the new trial motion on the moving papers, there was no reason for the judge to consider the possibility of holding an evidentiary hearing and there could be no abuse of discretion in failing to do so.[11]

 A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the

[11]Appellant would not be foreclosed from raising the juror misconduct issue in a timely habeas corpus petition if competent evidence of juror misconduct has been obtained. (§ 1473.)

ruling absent a manifest and unmistakable abuse of that discretion. (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) This is not such a case.

### C. *Admission of Evidence.*

 Appellant contends that the court erred in admitting evidence about his purported drug dealing and his Mafia and CIA connections.

 "A verdict may not be set aside on the basis of the erroneous admission of evidence . . . unless the party asserting error has preserved the question by a timely and specific objection to the admission of the evidence, or by a motion to strike or exclude the evidence." (*People* v. *Williams* (1988) 44 Cal.3d 883, 906 [245 Cal.Rptr. 336, 751 P.2d 395].) "[T]he objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility." (*Ibid.;* see also Evid. Code, § 353.)

 Appellant states that he made a pretrial *in limine* motion to exclude at the guilt phase evidence of his statements claiming to have Mafia and CIA connections and his statements regarding his purported drug dealing and other crimes. He did not. The record reflects instead only a motion filed on August 6, 1984, to prohibit introduction of evidence of appellant's criminal history to enhance the credibility of prosecution witnesses or substantiate their claims of duress. No reference to appellant's statements regarding his Mafia, CIA, and Teamsters connections appears either expressly or by inference in that motion. Appellant's purported drug dealing was not mentioned. The motion refers only to the two prior homicide acquittals, which the People had stipulated would not be introduced, his "prior criminal convictions" and his "prior criminal history (robbery, ex-felon with a firearm)."

When the motion was heard on August 17, 1984, however, defense counsel referred cryptically to "[t]he other issue with respect to mention of Mafia, C.I.A., organized crime, et cetera, et cetera, I think is more appropriate to deal with once you have heard a portion of the testimony of the witnesses." Neither the evidence to which objection may have been made nor the basis of the objection was made clear at this hearing.

During trial of the guilt phase, before Weller testified, defense counsel raised the subject again. He said only that the matter had been discussed before, that he anticipated that Weller might "inadvertently mention prior

criminal behavior by my client which resulted in conviction," and that he wanted it clear on the record that the witness had been cautioned not to mention those things. The prosecutor assured the court that Weller had been admonished not to mention the Oregon or Minnesota homicides, the federal firearms violations, or that appellant had been in prison and on parole. Defense counsel then stated: "I finally object to any mention of the Mafia or organized crime by Ms. Weller or by any other witness." He later explained the basis of the objection, citing Evidence Code section 352, and asserting that evidence of the statements was "extraordinarily inflammatory," "highly prejudicial, had only remote relevance" since duress was not a defense to a capital crime. The trial court overruled the objection, concluding that evidence that appellant had said he had been a member of the Teamsters, the Mafia, and the CIA, and had been engaged in drug activity, was relevant to assessing the credibility of the witness. No reference to appellant's claiming he had been a "hit man" or had killed before was to be permitted, however, and the jury would be instructed that whether the statements were true was not relevant and should not be focused on, as the issue was whether the witnesses were truthful. Defense counsel asked that the prosecutor also give the same instructions to Garcia. No further objection was made at the time Weller and Garcia testified.

Appellant now claims that Weller and Garcia were permitted to bolster their credibility by testifying that he had committed other uncharged crimes. He describes the evidence as highly prejudicial prior bad acts evidence and inadmissible evidence of character, although no objection was made on the ground that this was character evidence not made admissible by Evidence Code sections 1101 and 1103. As the People observe, Evidence Code section 780, not sections 1101 and 1103, is the proper referent. That section permits the jury to "consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony." (Evid. Code, § 780.)

Appellant identifies in particular the testimony by Weller that appellant said he was connected with the Mafia, Teamsters, and CIA, used the code name "Penguin," and that she believed he made his living from Mafia connections, testimony about his claim he was to have CIA training, showing her documentation of his purported training, and his claim that he could make things happen, Mafiawise, and have people followed. He also identifies Weller's testimony that appellant said he believed snitches should be killed and Garcia's testimony that appellant said that the lawyer he arranged to assist her with her divorce worked with appellant on Mafia matters and that the Mafia would watch her and would kill her if she drank alcohol or used drugs. He also claims that the testimony regarding cocaine use and

receipt of cocaine from de Laet, and about appellant's possession of marijuana should have been excluded.

As is apparent, almost none of this testimony about appellant's statements related to uncharged crimes. No objection was made to the testimony regarding appellant's actual possession of cocaine and marijuana, evidence that was relevant to the motive for and means by which the murders of de Laet and MacVicar were accomplished.

We see no possibility that the jury understood the testimony about appellant's statements to be evidence that appellant in fact had the Mafia, CIA, and Teamsters connections that he claimed. Apart from the evidence of narcotics possession, to which no objection was made, the evidence was not, as appellant now claims, evidence of prior bad acts. It was evidence that appellant claimed to have underworld connections and other relationships to powerful persons. The evidence was introduced to establish the effect of the statements on Garcia and Weller, not to suggest that appellant was actually a member of or had connections to the Mafia, CIA, or Teamsters.[12] The jury would have understood this. Indeed, appellant himself describes as "braggadocio" the statements he now claims were impermissible character assassination through admission of evidence of bad acts.

To the extent that appellant may now argue that the trial court erred in concluding that the probative value of the evidence outweighed its prejudicial impact and was sufficiently relevant to the credibility of Weller and Garcia to warrant admission, we disagree. The court did not err in overruling the objection made on those grounds. Absent an understanding of the relationship between Weller and Garcia and appellant, and the women's reasons for continuing the relationship, a jury might well have considered the testimony of Weller and Garcia about the murders of de Laet and MacVicar and the testimony about appellant's planning for and participation in those murders incredible. The evidence was relevant and did not threaten undue prejudice to appellant on the grounds now asserted.

D. *Denial of Mistrial.*

■ Appellant argues that the court erred in denying a motion for mistrial made after Weller testified that, while living in her Minnesota apartment after leaving the Johnsons' apartment, she had been told that appellant had put out a $25,000 contract on her life.

While being questioned regarding her postarrest decision to talk to investigators, Weller was asked whether before doing so she had received threats

---

[12]Nothing we say in this regard implies that we share appellant's view that membership in or connections to the CIA or the International Brotherhood of Teamsters is a bad act.

from anyone. She testified that before her arrest appellant had threatened to kill her if she ever said anything about what happened in California, and that Sondra Johnson told her that there was a contract out on her for $25,000 from appellant. The court sustained defense counsel's immediate hearsay objection. The prosecutor argued that the statement was not offered for its truth but to show that Weller believed she had reason to fear for her life. The court nonetheless sustained the objection and advised the jury that the matter should be stricken from their minds.

The court did not abuse its discretion in denying the motion for mistrial. The likely impact of this testimony was not incurable prejudice. The trial court had adequately admonished the jury to disregard Weller's testimony that Sondra Johnson said appellant had a contract out on Weller. The context and focus of the statement was that fear of appellant explained Weller's failure to report appellant's crimes earlier. This testimony was insignificant in any context, however, in light of the other evidence of threats by appellant made directly to Weller and Garcia that he would kill them if they mentioned the murders to anyone. Therefore, the court could reasonably conclude that any potential for prejudice was so minimal that it was cured by the admonition and a mistrial should not be granted. (*People* v. *Hines* (1997) 15 Cal.4th 997, 1038 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1154 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 565 [280 Cal.Rptr. 631, 809 P.2d 290].)

E. *Attempt to Call Garcia's Attorney as Witness.*

 During presentation of the defense case, appellant's attorney filed points and authorities describing Garcia's testimony about the timing of the prosecution offer of immunity, her denial that she or any agent of hers sought immunity for her, and her inquiry to an attorney as to why she needed it. He sought leave to call Garcia's attorney to impeach Garcia, arguing that Garcia had testified regarding what was or was not said during her relationship with the attorney, without objection, thereby waiving the attorney-client privilege by testifying to the substance of her conversations with counsel.[13] He made an offer of proof that the attorney had spoken to an attorney in defense counsel's firm, stating that he had told Garcia that she needed immunity because she faced prosecution for first degree murder and the gas

---

[13]Evidence Code section 954: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer if the privilege is claimed by: [¶] (a) The holder of the privilege; [¶] (b) A person who is authorized to claim the privilege by the holder of the privilege; or [¶] (c) The person who was the lawyer at the time of the confidential communication . . . ."

chamber, and that he had negotiated for immunity with the prosecutor for several months before it was granted by the trial court. The court ruled that there had been no waiver of the privilege, that the attorney would not be permitted to testify, and that the subpoena would be quashed.

The client is the holder of the attorney-client privilege. (Evid. Code, § 953.) ▆▆▆ Legal opinion and advice given the client by counsel is a confidential communication. (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 371 [20 Cal.Rptr.2d 330, 853 P.2d 496].) The right to claim the privilege is waived "with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceedings in which the holder has the legal standing and opportunity to claim the privilege." (Evid. Code, § 912.)

▆▆▆ Appellant does not suggest, and the record does not reflect, notice to Garcia that defense counsel intended to subpoena her attorney. There is nothing in the record to suggest that she had authorized the attorney to discuss his conversations with her with defense counsel in the manner the offer of proof claimed the attorney had done. Garcia had no opportunity to assert the privilege at the time appellant's counsel stated his intent to subpoena the attorney, and has had no opportunity to offer evidence regarding an intent to waive the privilege. Thus, only her denials while testifying at appellant's trial that anyone in her employ or her attorney had advised her that she faced criminal charges and should seek immunity may constitute a waiver.

▆▆▆ ▆ ▆ However, assuming, as appellant claims, that Garcia disclosed a significant part of the communication by her testimony, and that the privilege was waived as to the conversations regarding immunity,[14] the error in denying appellant leave to call the attorney was not prejudicial.

---

[14] A disclosure that a communication did occur that does not disclose the specific content of the communication may not waive the privilege. (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 602 [208 Cal.Rptr. 886, 691 P.2d 642].) Appellant's claim here is analogous to that made in *Mitchell*. There the client had revealed through answers to interrogatories that she had discussed a topic with her attorney; we recognized that her answers revealed the existence of the attorney-client relationship but, "*at most,* affirmed that she had discussed certain warnings with her attorneys, and in no way revealed a significant part of the substance of those discussions." (*Ibid.,* original italics.) Quoting, with approval, *Travelers Ins. Companies* v. *Superior Court* (1983) 143 Cal.App.3d 436, 444 [191 Cal.Rptr. 871], to the effect that answers to interrogatories must be " '*wide enough in scope and deep enough in substance to constitute "a significant part of the communication,*" ' " we held in *Mitchell* that the

Whether the attorney told Garcia she needed immunity and had negotiated with the district attorney was irrelevant to appellant's guilt. Impeaching her testimony on those tangential points would not have undermined her credibility so as to affect the verdict or the ruling on whether she was an accomplice as a matter of law.[15]

### F. *Knowing Use of False Testimony of Garcia.*

In a related argument, appellant claims that the prosecution knowingly used false testimony by Garcia, thereby denying him due process and a fair trial. The statements appellant identifies as "false" are Garcia's answers to questions asking when she received immunity. She responded: "A. Before the preliminary hearing, I believe in 1982" and "I thought . . . it was just before the preliminary, but I could be mistaken."

Appellant claims the prosecution "stipulated" that Garcia had immunity much earlier and that other parts of her testimony suggested that she did not want immunity, that immunity was foisted on her by the prosecutor, and that she made no effort whatever to "foment or facilitate it." Again, he claims, the "stipulation" demonstrates the falsity of the testimony. It does not.

The "stipulation" to which appellant refers is, in fact, a part of a settled statement on appeal approved by the trial judge in 1989. The in-chambers discussion of the attorney-client privilege was one of the topics covered by that settled statement. The settled statement recites that during the discussion, defense counsel asserted that the testimony of Garcia's attorney would impeach Garcia's claim that she did not seek immunity and that the prosecution gave it to her without her asking for it.

We have reviewed the settled statement and find nothing in the record that would establish either that Garcia testified falsely or that the prosecution

---

acknowledgment that a communication on the topic occurred did not have the depth and specificity necessary to constitute disclosure of a significant part of the communication and thus did not waive the attorney-client privilege. (37 Cal.3d at pp. 602-603, original italics.)

[15]We find no merit in appellant's further argument that because the prosecution sought to bolster Garcia's credibility with her testimony that she did not seek immunity through anyone with whom she was associated or anyone in her employ, he was denied his state and federal constitutional right to confrontation. Appellant was not denied the right to, and in fact did, thoroughly cross-examine Garcia. The ruling he challenges here did not restrict his right to confrontation and cross-examination. It precluded only the presentation of other evidence to impeach Garcia on a collateral matter. (Cf. *People* v. *Mincey* (1992) 2 Cal.4th 408, 463 [6 Cal.Rptr.2d 822, 827 P.2d 388] [Sixth and Eighth Amendments gave capital defendant right to cross-examine witness regarding belief that testimony would lead to lenient sentence, based on conversation with counsel, notwithstanding assertion of attorney-client privilege. Inquiry was directed to bias and thus credibility of witness.].)

knowingly permitted her to do so. Her testimony that she received immunity before the preliminary hearing was not false. Only a court may grant transactional immunity from prosecution, and the court may do so only on written request of the prosecutor. (§ 1324; *People* v. *Hunter* (1989) 49 Cal.3d 957, 973 [264 Cal.Rptr. 367, 782 P.2d 608].) Even if immunity had been offered earlier, she actually received it only when the court granted immunity before the preliminary examination. Our conclusion is not undermined in any way by the prosecutor's inaccurate description of her offer to seek or insist on immunity for Garcia as a grant of immunity. Nothing in the record suggests that Garcia had any reason to understand either the prosecutor's question or the questions asked of her on cross-examination to refer to the prosecutor's offer to seek immunity rather than to what was expressly asked on direct, "[W]hen did you receive immunity." Garcia received immunity when and only when the court granted it.

As to Garcia's testimony that the prosecution, not she, initiated the idea of immunity, the prosecutor's argument, as reflected in the settled statement, supports Garcia's testimony. The record does not suggest, let alone establish, falsity or knowing use of false testimony by the prosecution.

G. *Unnecessary Security Procedures.*

██ After hearing from law enforcement officers responsible for maintaining custody of appellant while he was confined in the Santa Cruz County jail and for court security,[16] the trial court permitted, over defense objection, screening of all persons who entered the courtroom. Security provisions included use of a hand-held metal detecting wand, patdown of outer clothing, examination of bags and purses for weapons, locking the courtroom door, and positioning an extra deputy in the courtroom with two additional deputies outside the courtroom. Until a jury was selected, the screening included prospective jurors who often appeared en masse for a hardship voir dire in advance of the sequestered individual voir dire. At that time prospective jurors in Santa Cruz County were not given identification badges and therefore could not be distinguished from the general public.

Appellant now contends that the trial court erred in failing to require the law enforcement officials responsible for courtroom security to justify the security measures at a hearing in which he could examine them regarding the facts on which they based their belief that these measures should be employed. He repeats his claim that these "extraordinary" security precautions

---

[16]Court security personnel as well as investigators from the office of the district attorney attended the sessions with the trial judge. Concerns that appellant might escape and for the security of witnesses who allegedly had been threatened were expressed. Extra security was requested by the district attorney's office.

implied that he was dangerous and frightening, thereby denying him a fair trial.

The record fails to support the latter claim. Instead, it suggests that those prospective jurors who were questioned about the subject during voir dire viewed it as a routine procedure like that at an airport, a good idea, indicative that there was something important or a "big" or "severe" case, and made some persons (not necessarily jurors) feel like criminals. No prospective juror responses during voir dire about either their own reactions or those of other persons whose comments they overheard expressed concern that appellant might be dangerous. Those who speculated at all thought that the security might be due to danger from persons entering the courtroom as spectators. No juror who actually sat on the case is identified as being a person who believed that the security precautions were instituted because the defendant was dangerous and, as appellant concedes, once the jury was selected the jurors were no longer subjected to search.

Neither due process nor any other constitutional right of a criminal defendant mandates a hearing on the necessity for courtroom or courthouse security. Appellant's attempt to analogize the courtroom security measures of which he complains to shackling and other physical restraint of a defendant, and his reliance on authority related to that practice is unpersuasive. Both this court and the United States Supreme Court have recognized that the use of security personnel, even in the courtroom, is not so inherently prejudicial that it must be justified by a state interest specific to the trial. "The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." (*Holbrook* v. *Flynn* (1986) 475 U.S. 560, 569 [106 S.Ct. 1340, 1345, 89 L.Ed.2d 525]; see also *People* v. *Duran* (1976) 16 Cal.3d 282, 291, fn. 8 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1] ["Unless they are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor."].)

In *Holbrook* v. *Flynn, supra*, 475 U.S. 560, the high court opted for a case-by-case consideration of whether challenged security measures are so inherently prejudicial as to deny the defendant the constitutional right to a fair trial. The court recognized that jurors' initial reaction at the outset of a trial is not dispositive as the jurors may not be aware of the impact the practice will have on their attitude toward the accused. Therefore, the court must determine only whether the security practice or practices presented an "unacceptable risk" that impermissible factors will come into play. (*Id.* at p. 570 [106 S.Ct. at p. 1346].) The court should look "at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." (*Id.* at p. 572 [106 S.Ct. at pp. 1347-1348].)

A trial court has broad power to maintain courtroom security and orderly proceedings. (Code Civ. Proc., § 128; *People* v. *Woodard* (1992) 4 Cal.4th 376, 385 [14 Cal.Rptr.2d 434, 841 P.2d 954]; *People* v. *Merkouris* (1956) 46 Cal.2d 540, 556 [297 P.2d 999].) That discretion was not abused here. Appellant has not demonstrated actual prejudice, and we find nothing in the description of the security measures utilized at his trial in the Santa Cruz County Superior Court that is so inherently prejudicial as to warrant a conclusion that in reaching a verdict the jurors might have been affected by their observation of those measures.

## H. *Right of Confrontation.*

During her opening statement the prosecutor told the jury that it would hear evidence about Larry Dahl's involvement in the events leading to the murders and that Dahl had been convicted in federal court of transporting firearms. No objection was made to any statement in this part of the prosecutor's opening statement. The prosecutor subsequently asked Weller several questions regarding her past testimony against Dahl. The court sustained a hearsay objection to her "yes" response to whether Dahl had been convicted.

Appellant contends that through this examination of Weller the prosecution was able to use evidence of Dahl's conviction to bolster Weller's credibility and thereby prove his guilt. In so doing, he claims, he was denied due process and the right to confrontation.

We infer that the confrontation claim is based on the hearsay nature of the evidence that Dahl had been convicted. The court immediately sustained the

hearsay objection, however, and appellant was afforded the opportunity to confront and cross-examine Weller. There was no Sixth Amendment violation.

Even assuming misconduct in referring to the conviction during the opening statement and assuming that sustaining the objection when Weller testified that Dahl had been convicted was not sufficient, we see no possibility of prejudice. Weller's testimony regarding Dahl's involvement in supplying the gun and silencer used in the murder was corroborated by Sondra Johnson, and that aspect of Weller's testimony was, in any event, a relatively insignificant part of her testimony. The possibility that the jury may have concluded that Weller was truthful in her testimony regarding appellant, because another jury convicted Dahl after her testimony about his delivery of the gun, is too remote to warrant the inference of prejudice that appellant would have us draw.

These facts are not comparable to those before us in *People* v. *Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1], on which appellant relies. There we held that evidence of the conviction of the defendant's wife as an accessory after the fact necessarily was irrelevant, but we recognized that the evidence suggested that the defendant, whom the wife had aided, was guilty also. We found the error harmless, however, because the evidence that the defendant's wife had been convicted was never emphasized. The jury learned of the conviction only through the grant of a request for judicial notice of that conviction and several others suffered by the defendant's wife. (*Id.* at pp. 1294-1295.)

Here the evidence that Dahl had been convicted after Weller testified against him was even more tangential. It did not imply appellant's guilt, as did the evidence in *People* v. *Cummings, supra,* 4 Cal.4th 1233. It suggested only that a jury believed Weller when she testified that Dahl delivered the gun and silencer to appellant. Assuming error, it was clearly harmless and did not result in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

I. *Refusal to Instruct That Garcia Was Accomplice as a Matter of Law.*

Section 1111 prohibits conviction on the testimony of an accomplice unless the testimony is corroborated by other evidence tending to connect the defendant with the commission of the crime. The section defines accomplice "as one who is liable to prosecution for the identical offense charged against the defendant . . . ."

When the evidence at trial would warrant the jury in concluding that a witness was an accomplice of the defendant in the crime or crimes for

which the defendant is on trial, the trial court must instruct the jury to determine if the witness was an accomplice. If the evidence establishes as a matter of law that the witness was an accomplice, the court must so instruct the jury, but whether a witness is an accomplice is a question of fact for the jury in all cases unless "there is no dispute as to either the facts or the inferences to be drawn therefrom." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 772 [254 Cal.Rptr. 257, 765 P.2d 419].) At the time of this trial the jury was to be instructed in either case that the testimony of an accomplice is to be viewed with distrust and that the defendant may not be convicted on the basis of an accomplice's testimony unless it is corroborated. (See *People* v. *Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].)[17]

Failure to instruct pursuant to section 1111 is harmless if there is sufficient corroborating evidence. Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. (*People* v. *Frye* (1998) 18 Cal.4th 894, 966 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People* v. *Zapien*, *supra*, 4 Cal.4th at p. 982.)

 The trial court instructed that Weller was an accomplice in the murders as a matter of law. As to Garcia, the judge refused a defense request for the same instruction and instructed the jury that it must decide if she was an accomplice. The court did not err.

Weller's testimony and Garcia's own testimony established that Garcia carried out tasks preliminary to the murders, drove the victims to the location at which they were killed, and lulled them by performing the weapons search during which appellant shot them. ██ ██ Therefore, Garcia's status as an accomplice turns on whether as a direct perpetrator,[18] conspirator, or aider and abettor, she was aware that de Laet and MacVicar were to be killed,[19] or was engaged that way in any other crime the foreseeable result of which might be murder.[20]

 There was strong circumstantial evidence that Garcia was an accomplice in the murders. However, that evidence does not compel a

[17]In *People* v. *Guiuan* (1998) 18 Cal.4th 558, 569 [76 Cal.Rptr.2d 239, 957 P.2d 928], we recognized that the instruction to view accomplice testimony with distrust is not appropriate in all circumstances and suggested a modified instruction that the testimony be viewed with "caution" when offered by the prosecution.

[18]Section 31: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

[19]To be liable as an aider and abettor, the person must act both with knowledge of the perpetrator's criminal purpose and the intent of encouraging or facilitating commission of the offense. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 90-91 [270 Cal.Rptr. 817, 793 P.2d 23].)

[20]Like a conspirator, an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the

conclusion that she was an accomplice. As noted earlier, accomplice status is a jury question unless there can be no reasonable dispute as to the facts or the inferences to be drawn therefrom. (*People* v. *Fauber* (1992) 2 Cal.4th 792, 834 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People* v. *Stankewitz, supra,* 51 Cal.3d 72, 91 [270 Cal.Rptr. 817, 793 P.2d 23].) In determining whether to instruct that Garcia was an accomplice as a matter of law, the court necessarily considered whether the jury might find that Garcia's denial that she knew of appellant's intent to kill was credible. Having impliedly concluded that Garcia's testimony was not inherently incredible, the court did not err in determining that she was not an accomplice as a matter of law since the record does not dictate a conclusion that Garcia aided appellant knowing his homicidal intent.

Moreover, the evidence was sufficient to corroborate the accomplice testimony of Weller and Garcia. Although Weller was an accomplice as a matter of law, having admitted knowing participation in bringing the victims to Santa Cruz, and thus her testimony could not corroborate Garcia's testimony (*People* v. *Fauber, supra,* 2 Cal.4th at p. 834), there was other corroborating evidence sufficient to connect appellant to the murders. Sondra Johnson testified that appellant admitted that he had killed two people in California and their bodies would not be found because they had been chopped up. Her testimony regarding the delivery of the murder weapon to defendant and about appellant's direction to mail the card signed by de Laet was strong circumstantial evidence that appellant planned and committed the murders. Johnson was not an accomplice in the murders. Additional corroboration is found in Edwards's testimony that appellant showed unusual interest in the discovery of the first skull, asking why a mushroom hunter was "up there," a reference to the location of the murders.

## IV

### PENALTY PHASE

#### A. *Prosecution Evidence.*

After the original Santa Cruz County jury was unable to reach a penalty verdict, much of the prosecution guilt phase evidence describing the circumstances of the murders was presented again to the Stanislaus County penalty jury. Evidence regarding events in Minnesota and Hawaii preceding the

person he aids and abets." (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].) Although appellant was engaged in grand theft by false pretenses (§§ 484, 487), Garcia testified that she dug the holes and purchased the lime in the belief that appellant intended to bury money and/or drugs. Appellant does not argue that Garcia was aware of or was an accomplice to the grand theft, or that the murders were the foreseeable result of that offense.

murders was offered in a somewhat abbreviated form, principally through the testimony of Weller, with less emphasis on appellant's claim to have CIA and Mafia connections and on his occasionally bizarre and dominating behavior while in Hawaii. However, on cross-examination, defense counsel did elicit testimony regarding appellant's reference, during a period of heavy cocaine use, to CIA connections, bombs in cars, and tapped telephones, as well as Weller's belief that this was "craziness" and that appellant was "crazy or having a nervous breakdown." Cross-examination also brought out a description of appellant's heavy cocaine use during the period immediately before the trip to Santa Cruz.

Weller's testimony included a description of appellant's plan to stage a Christmastime armored car robbery with Jim Johnson, Garcia, and Weller (who was to dress as a nun and carry a gun under her habit). Weller was then trying to figure out how to get away from appellant, as she did not want to be part of such a robbery.

Weller also described, in greater detail than in her prior testimony and statements, what appellant had told her on December 27, 1981, the evening that MacVicar brought part of the $250,000 to the Millbrae Travelodge, about the plan to set up a bogus cocaine deal. She testified that he described the plan, including his intent to kill both MacVicar and de Laet and to dismember the bodies, and asked her if she liked MacVicar and if she thought she could kill him.[21] Appellant said they would go to Santa Cruz and that de Laet would go along. Garcia would be there but Garcia did not know what was going to happen.[22] Appellant told Weller that although he had not been sure whether he wanted to kill de Laet, he had decided that he would do so. He appeared to be angry with de Laet because he had given de Laet her money and cocaine. She had taken the cocaine he gave her and slept with a "nigger," which displeased him.[23] When Weller asked appellant why he could not just set up MacVicar and de Laet and take the money, appellant said the persons from whom MacVicar and de Laet got the money knew appellant and would probably come after him.

[21]A principal focus of the cross-examination was on inconsistencies between Weller's testimony in this proceeding and her prior testimony at the preliminary hearing, in Minnesota proceedings, and in her statements to investigating officers. Weller acknowledged that she had lied in the past when she denied knowing that MacVicar and de Laet were to be killed. She also acknowledged numerous other lies in pretrial statements and perjury at the preliminary hearing, many of which prior statements had minimized her knowledge of, or involvement in, events prior to the actual murders, and attempted to cover up the involvement of the Johnsons and Larry Dahl.

[22]Weller had not testified or stated previously that appellant told her that Garcia did not know what was going to happen.

[23]Weller had testified earlier that appellant used this term for any dark-skinned person, including Weller's Hawaiian former boyfriend of whom he disapproved.

Garcia also testified, describing her relationship with appellant and her involvement in the events leading to, during, and after the murders. She described appellant's claim to be part of the Mafia, one of the seven men of the world to whom respect must be given, his claim to be operating a marijuana farm on Hawaii land owned by a policeman, and his claim to be engaged in real estate through his Central States Properties firm in which the Teamsters Union was involved. Garcia also testified about being sent to California to purchase cocaine for appellant, adding that appellant instructed her to tell the contact in California about appellant and his Mafia connections. She described the beatings he administered to her, his threats to kill her, an instance when he strangled her until she passed out, and his instructions when sending her back to California to live with her mother. She believed, based on what appellant told her and his knowledge of her activities, that appellant was having her followed and had installed a tape recorder in the car she drove so that he knew everything that she did.

Garcia also described appellant's instructions to her to learn as much as possible about Mr. Garcia's armored car operation so that he could be robbed, and appellant's instruction that she marry Mr. Garcia. Her testimony regarding the events immediately before, during, and after the murders was consistent with her guilt phase testimony, except that in her penalty phase testimony she testified that she now remembered that de Laet was not shot the second time until de Laet had been dragged to the location of the holes.

Garcia testified that when appellant gave her the envelope of money on December 29, 1981, he said it was financial help for her grandfather for which she had asked. She denied that the money was payment for digging the holes as she apparently had stated in a pretrial interview. She also testified regarding additional threats against her and her family made by appellant after the murders and an incident when appellant was staying in Edwards's house in which appellant started hitting Edwards because Edwards could not stay awake.

Sondra Johnson testified about appellant's statement on the night he and Garcia arrived at the Johnson apartment in Edina, Minnesota, that he had killed two people in California, had done a "fantastic job" and the crime or the bodies would never be discovered because the bodies had been chopped up and were just as good as out to sea. She also testified about the silencers her husband constructed, appellant's Christmas 1981 request that a gun and silencer be delivered to him, her assistance to Larry Dahl in renting the car Dahl drove to California to make the delivery, and her January 1982, flight to Miami to mail the greeting card given to her by Dahl and addressed to

appellant in Hawaii.[24] Her testimony regarding these events and those occurring after the murders when Weller and then appellant and Garcia came to Minnesota was essentially the same as that given during the guilt phase. She testified that selection of the album "MacVicar" for inclusion on the tape played for appellant during the ride from the airport was a coincidence. She and Jim Johnson did not realize at the time the tape was made that there was a connection between the name of the tape and that of the murder victim. The tape was probably made before they knew about the murders, and when Weller revealed the murders she had not told them the name of the male victim.

Johnson acknowledged that in the first statement she gave to officers investigating the crime she had attempted to protect Dahl and did not describe his role in delivering the gun with the silencer to appellant in California. She acknowledged that she had not told the officers that Weller accompanied Jim Johnson to Florida to buy cocaine, and that she had been wrong when she said they drove a rental car.

Johnson also testified that during appellant's visit to the Johnson apartment on February 20, 1982, Jim Johnson ran out of the apartment in what may have been a cocaine-induced state. When he did so, appellant put a gun to her head. She also described an incident when appellant and Garcia returned to the apartment after moving to a hotel, during which appellant took the Johnsons to the bedroom to have what he said was a "court" like one for the Mafia to decide which of them was wrong and what the penalty would be. The incident ended only when Jim Johnson got on his knees and kissed appellant's ring. Before holding "court" appellant told the Johnsons that he had arranged to have her children and those of her husband die a horrible kind of death if appellant did not return to the hotel at a specified time. She added to her guilt phase testimony regarding the Johnsons' relationship with appellant that when she and her family visited appellant in Hawaii, appellant had talked about killing people, saying that Hawaii was a wonderful place for bodies and that bodies could be buried in caves and the whole Pacific Ocean was a burial ground.[25] She also testified that she heard a tape of a telephone conversation between Jim Johnson and appellant after Dahl had returned from California in which appellant told Jim Johnson that he wanted Dahl killed because Dahl talked too much.

---

[24]Prosecution Investigator Sammy Robustelli testified that the card, signed "Lauren," was found in a search of appellant's Hawaii home.

[25]Appellant moved for mistrial on the ground that the evidence was not proper aggravating evidence and no notice had been given that additional threats of violence would be offered as aggravating evidence. The prosecution argued that the evidence corroborated Garcia and Weller, supporting their testimony that appellant's statements caused them to fear him, and thus enhanced their credibility, which the defense had challenged. The court denied the motion for mistrial, noting that the testimony was not that appellant said he had buried bodies.

Johnson acknowledged that whenever Jim Johnson was at home, she and he used cocaine constantly, sometimes $10,000 worth in a month, and were always under the influence of cocaine and, at times, things were "hazy" as a result of cocaine use and lack of sleep. She admitted her role in the murder of Thomas Carroll by Jim Johnson.

The preliminary hearing testimony of Diane Edwards, and the guilt phase trial testimony of several other minor witnesses was read to the jury. A tape of a statement made by appellant during a three-hour postarrest interview was played for the jury, and the penalty phase jury had a view of the scene.

Aggravating evidence of appellant's two prior felony convictions was also presented.

B. *Defendant's Evidence.*

Although appellant did not request a "lingering doubt" instruction and said he would not argue that theory,[26] he sought through cross-examination of prosecution witnesses to cast doubt on the credibility of the witnesses. The cross-examination emphasized similarities between the MacVicar/de Laet murders and the murder of Carroll, who had been buried in a shallow grave with lime covering his body, and mentioned Jim Johnson's postarrest instructions to Sondra Johnson, which included directions to chop up the body. He also sought to stress the culpability of Garcia and Weller vis-à-vis appellant.

Appellant also presented much of the defense guilt phase evidence, using the prior recorded testimony of 11 defense witnesses. This testimony included the testimony of Murta and Bradley that MacVicar was a marijuana dealer; of Perlin that appellant and Garcia seemed to be getting along well in the summer of 1980; of Rochelle that Garcia and Donald Garcia had a normal relationship, but he was surprised at how quickly they married; testimony about Grundherr's appearance at the murder scene with his dogs while officers were searching; Grundherr's testimony; the testimony of the Minnesota pathologist that Carroll's body was covered with noncaustic hydrated lime when unearthed and that the head bore postmortem blunt

---

[26]In fact, in his closing argument defense counsel did ask rhetorically whether Jim Johnson was with Dahl at the San Francisco Airport Hilton Hotel and was a part of the crime and questioned whether it was just coincidence that the Carroll murder had similarities to the MacVicar/de Laet murders, and that MacVicar was the name of the tape played for appellant on his arrival in Minneapolis after the murders. This argument was followed, however, by argument that Weller and Garcia were willing confederates, accomplices, who had been blessed with immunity even though the whole truth had not been told and they continued to protect others. Justice, therefore, demanded life in prison without parole.

traumatic injuries; and the testimony of a Hertz Corporation representative that the cars rented (by the Johnsons on December 29, 1981, and Dahl on December 25, 1981) at the St. Paul/Minneapolis International Airport had been driven about 3,517 and 4,800 miles during the rental.

Five additional witnesses offered mitigating evidence.

Bonnie Hayes, who had married appellant on November 18, 1983, testified that she had joined the Poor Clare cloistered order of Roman Catholic nuns in 1952. She left the order in 1983, after having been abbess of the community for several years, because she felt there was something more that she was to do. She briefly lived in a Santa Cruz homeless shelter operated by a Catholic worker group in Salinas that helped street people in Santa Cruz, contracted pneumonia spending time on the streets herself in order to share the life of the homeless more closely, spent three months with a lay religious group then known as the Holy Trinity Community, and later developed a counseling ministry at Soledad Prison and at the Santa Cruz and Monterey County jails.

Mrs. Hayes met appellant after a member of the Holy Trinity Community who was working with jail inmates showed her correspondence from appellant, who was then in jail. She was impressed by appellant's letters, felt that she knew him, and began an almost daily correspondence with appellant, whom she came to see as having positive characteristics notwithstanding a bad background. She believed he was sincere about Christianity. When she first visited appellant, she experienced romantic feelings toward him. She thought his recent baptism indicated that he had "begun a different journey." They decided to marry after about 16 visits. They corresponded daily. When appellant was in Santa Cruz they spoke on the telephone for an hour each day and she was able to see appellant twice a week. Mrs. Hayes testified that religion is an important part of their relationship and she does not believe that appellant "conned" her. She is not troubled by appellant's five prior marriages. She does not want to know about his past and has not discussed either his guilt or innocence of the commitment offenses or their details, as she believes that "the past is past."

Mrs. Hayes testified that she viewed appellant's life in prison as an opportunity for him to help others in prison.

Al Boucher, a nondenominational minister who had been a prison and jail chaplain for 10 years, testified that, based on his experience, he is able to distinguish a sincere "jailhouse conversion" from one that is manipulative. He visited appellant weekly for two years at the request of Mrs. Hayes after

their marriage. He believes appellant truly loves the Lord, is not conning him, and is a positive influence for Mrs. Hayes and his fellow inmates. This witness had never discussed appellant's offenses with him.

Kelly Graff, serving a life term for first degree murder at Deuel Vocational Institution, testified that while Graff was in solitary confinement in the Santa Cruz County jail, appellant gave him a Bible. The two discussed God and the Scriptures. Appellant told Graff he could straighten out his life through religion. As a result Graff, whose prison job was a life skills teacher's assistant, now believed he was on the right track.

John De Soto, a former drug addict convicted of inflicting corporal punishment on a child and, confined at Soledad state prison, testified that he met appellant while both were in the Santa Cruz County jail. They discussed religious issues and appellant urged him to practice a practical Christianity in his life outside, not just in jail. Appellant explained several Bible verses to De Soto including some about the importance of "respecting one another." As a result of appellant's counseling, De Soto has accepted Christ into his life and has sought forgiveness. He participated in an inmate religious group and had acted as a minister when none was available.

De Soto testified that he believed there was a role for older inmates like appellant in prison. People like appellant were the tools that will make the difference in many inmate's lives because they can relate to another inmate who has faced the same problems they have.

John Lantis, a deputy sheriff assigned to the jail, had daily interaction with appellant. He testified that appellant was very cooperative, read many books including spiritual ones, and did not attempt to escape when another inmate cut a hole in a fence around a rooftop exercise area and did so.

V

PENALTY PHASE ISSUES

A. *Venue.*

After the trial court granted appellant's motion for a change of venue, the Administrative Director of the Courts[27] proposed trial in Marin, Stanislaus, or San Joaquin County. Appellant expressed a preference for Marin County,

---

[27]California Rules of Court, rule 842: "When the court in which the action is pending determines that it should be transferred pursuant to Section 1033 or 1034 of the Penal Code, it shall advise the Administrative Director of the Courts of the pending transfer. Upon being

the prosecutor for either of the others, Stanislaus County being the first choice. Appellant contends that the court erred in selecting Stanislaus County.

At a hearing on the question, appellant offered evidence of the results of a demographic study based on the 1980 census data. Professor Dan Archer, a professor of sociology at the University of California at Santa Cruz, who had conducted the study, testified that sociologists and demographers consider socioeconomic status the most important comparison factor. In that aspect of his study, Marin County was slightly higher than Santa Cruz County, but was much closer to Santa Cruz County than either Stanislaus County or San Joaquin County.[28] On the other hand, the ethnic/racial composition of Stanislaus County was closer to that of Santa Cruz than that of Marin, as was the median years of schooling.

Appellant argued, based on this study and the location of Marin County, close to the San Francisco International Airport, which made Marin County more convenient for Bay Area and out-of-state witnesses, that Marin County should be chosen. The prosecution argued that trial in Stanislaus County would be less expensive, and because some Stanislaus County cases had been tried in Santa Cruz County, it was appropriate to have a Santa Cruz County trial heard in Stanislaus County.

The trial court concluded that, as between the three counties to which the trial might be transferred, demographics were not relevant, and because the court did not find much of any significance to the exercise of discretion in the evidence offered, the decision would be arbitrary. In the end, the court concluded, in this case the selection of an alternate venue was a matter of court administration. Absent evidence that pretrial publicity would pose a problem in one of the proposed counties, the court had discretion to choose and, since Santa Cruz County had "extended itself in terms of Stanislaus County cases, [it] seems . . . not unreasonable that that's probably for that reason the better of the three choices."

Again, there was no error. In selecting the county to which a case is transferred, the court must exercise its discretion in the interest of justice to assure a defendant a fair trial. It should consider publicity and the relative

---

advised the Director shall, in order to expedite judicial business and equalize the work of the judges, suggest a court or courts that would not be unduly burdened by the trial of the case. Thereafter, the court in which the case is pending shall transfer the case to a proper court as it determines to be in the interest of justice."

[28]Marin County had a higher number of persons who had completed 16 years of education, and had professional or managerial occupations, and more residents in the higher income brackets.

hardship to the parties in trying the case in the proposed locations and may also consider conservation of judicial resources and public funds, and convenience of witnesses. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 804 [281 Cal.Rptr. 90, 809 P.2d 865].) ▆▆▆ No issue was raised with respect to possibly prejudicial publicity in any of the proposed counties, thus this was not a factor. The court did consider hardship, but no real hardship issue arose. Witnesses were able to attend.

Appellant did not offer any basis for concluding that a fair trial could not be held in any of the counties. The jury was selected from panels that reflected a full spectrum of economic and social backgrounds. The panels were drawn from a fair cross-section of the Stanislaus County population, and, assuming relevance, the record does not support a conclusion that the attitudes of the prospective or actual jurors differed significantly from those of the Santa Cruz County prospective and actual jurors.

No authority supports appellant's claim that, when a defendant obtains a change of venue from that in which the offense was committed, due process mandates a trial before a jury which is chosen from panels which replicate the socioeconomic characteristics of the venue in which the offense was committed.[29] California Rules of Court, rule 842 emphasizes consideration of judicial economy and court administration, concerns which the court did consider in selecting Stanislaus County. However, it selected Stanislaus County only after concluding that appellant's evidence regarding socioeconomic factors did not suggest that a fair trial could not be held in Stanislaus County.

B. *Competency.*

▆▆▆ Appellant contends that the trial court erred in denying his motion that competency proceedings be undertaken, a motion made at the time he appeared for imposition of judgment. He asserts that this claim applies equally to the guilt phase of the trial. The motion asserted that appellant was then incompetent and thus could not be "adjudged to punishment." (§ 1367.) He supported the claim with a litany of facts, none of which actually related

---

[29]Appellant relies on the American Bar Association's Standards for Criminal Justice (3d ed. 1993) Trial by Jury, standard 15-1.4, which identifies the following factors for consideration when a change of venue is ordered: 1. the extent and nature of pretrial publicity; 2. relative burdens on the courts; 3. relative hardships on the parties; 4. the racial, ethnic, religious and other relevant demographic characteristics of the proposed venue insofar as they may affect the likelihood of a fair trial; and 5. any other factor required in the interest of justice.

to his competence at the time of sentencing to understand the nature of that proceeding or to rationally assist his counsel at that proceeding.[30]

 Trial of an incompetent defendant violates the due process clause of the Fourteenth Amendment to the United States Constitution (*Godinez* v. *Moran* (1993) 509 U.S. 389, 396 [113 S.Ct. 2680, 2685, 125 L.Ed.2d 321]) and article I, section 15 of the California Constitution. Those protections are implemented by statute in California. A criminal defendant is incompetent and may not be "tried or adjudged to punishment" if "as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) Section 1368 mandates a competency hearing if a doubt as to a criminal defendant's competence arises during trial. That may occur if counsel informs the court that he or she believes the defendant is incompetent (§ 1368, subd. (b)), or "[i]f during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant." (§ 1368, subd. (a).)

Whether on motion of the defendant or sua sponte, the trial court is required to suspend criminal proceedings and hold a hearing to determine competency whenever substantial evidence of incompetence is introduced. "Substantial evidence is evidence that raises a reasonable doubt about the defendant's competence to stand trial." (*People* v. *Frye, supra,* 18 Cal.4th at p. 952.) Evidence regarding past events that does no more than form the basis for speculation regarding possible current incompetence is not sufficient. (*People* v. *Medina* (1995) 11 Cal.4th 694, 733 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

---

[30]In support of the motion, appellant read a statement in which he asserted that various violations of his rights in jail, migraine headaches, inability to sleep, use of medications, and solitary confinement rendered him unable to rationally assist defense counsel or to conduct his defense for his best interests, and caused him to reveal facts that otherwise would not have been revealed to the jury. Far from demonstrating incompetence, this listing of complaints about his past mental problems and the conditions and treatment in the county jail and their allegedly debilitating impact shows that appellant was very aware of the nature of the proceedings and was acting rationally in his attempt to obtain a competency hearing and a new trial.

In addition to complaining about jail conditions, appellant asserted that his "babbling" statement to police, a statement by a college graduate with a high IQ, reflected either brain damage or incompetence, as did Garcia's testimony regarding his delusions. On its face the statement to police reflects nothing more than an intelligent, manipulative arrestee, possibly under the influence of cocaine, who thinks he is smart enough to make a statement without incriminating himself. Garcia's testimony did, indeed, suggest that while high on cocaine appellant was delusional. The record does not contain evidence that he was either high on cocaine or delusional at the time of trial.

Appellant also referred to his prior acquittal of murder on grounds of insanity, past psychiatric treatment, a prior finding of incompetence to stand trial, his commitment to a mental institution in Oregon, and treatment with psychotropic medication. None of this established present incompetence to stand trial.

 The short answer to appellant's claim is that nothing in the record suggests that at any time during these proceedings appellant was unable to understand the nature of the proceedings or to assist counsel in conducting the defense in a rational manner. Defense counsel never expressed a doubt as to appellant's competence. Moreover, appellant persuaded the trial court to permit him to act as cocounsel during the penalty trial. His presentation of that motion, the support he offered for it, and his subsequent presentation of several presentence motions and arguments in support thereof demonstrate beyond any doubt that he was fully aware of the nature of the proceedings and able to assist counsel. Appellant's motions for a continuance, for new trial based on newly discovered evidence and denial of various constitutional rights, for a competency hearing, and his claim that he was unable to rationally assist defense counsel themselves reflect complete awareness of the nature of the proceedings and, on their face, completely rational legal decisionmaking.

The trial court denied all of appellant's motions, and with respect to the motion for a competency hearing ruled that from the court's observation it appeared that appellant understood the nature of the proceedings and was able to assist and act as his own counsel. The court declared that no doubt had arisen in the court's mind as to appellant's mental competence.

If appellant was in fact incompetent during any part of these proceedings that fact is not apparent on the face of this record. There was no error in failing to order a competency hearing.

### C. *Prosecutorial Misconduct in Closing Argument.*

 Appellant argues that during the penalty phase closing argument the prosecutor engaged in misconduct by improperly diminishing the jurors' sense of personal responsibility for the verdict to be rendered. No objection was made on that basis.

The claim lacks merit. Argument that diminishes the jury's sense of responsibility is argument that might lead the jury to believe that the ultimate decision on whether the defendant lives or dies is made by the appellate court, or that the responsibility for *sentencing* lies elsewhere. The jury must not be misled as to its role as sentencer. That type of argument renders a death sentence unreliable under the Eighth Amendment. (*Caldwell v. Mississippi* (1985) 472 U.S. 320, 323 [105 S.Ct. 2633, 2636-2637, 86 L.Ed.2d 231].) *Caldwell* is " 'relevant only to certain types of comment— those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing

decision.' *Darden* v. *Wainwright*, 477 U.S. 168, 184 [106 S.Ct. 2464, 2473, 91 L.Ed.2d 144], n. 15 (1986)." (*Romano* v. *Oklahoma* (1994) 512 U.S. 1, 9 [114 S.Ct. 2004, 2010, 129 L.Ed.2d 1].) We have recognized that an argument to the effect that the law rather than the jury decides whether death is the appropriate penalty is improper for the same reason. (*People* v. *Farmer* (1989) 47 Cal.3d 888, 928-931 [254 Cal.Rptr. 508, 765 P.2d 940].)

 The prosecutor's argument in this case in no way misled the jury as to its role as sentencer. There was no suggestion that the jury was not the ultimate decision maker, or that the law, not the jury, dictated the punishment. The argument was simply that appellant was responsible for being a person who was now eligible for the death penalty.

The jury was not only told that its role was to determine if aggravating circumstances outweighed mitigating, it was also told that its function was to determine if the death penalty was appropriate. Nothing in the prosecutor's argument undercut this advice. Rather, as in *People* v. *Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980] and *People* v. *Fierro* (1991) 1 Cal.4th 173 [3 Cal.Rptr.2d 426, 821 P.2d 1302], the argument was simply that the moral blame for the murders and their consequences lay with appellant, not the jurors or elsewhere.

D. *Wheeler Error.*

 Appellant next contends that he was denied a jury selected from a representative cross-section of the community because the prosecutor exercised a peremptory challenge to excuse Chariesse Oxendine, the only African-American prospective juror on the panel.

 In *People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*), this court held that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." Thereafter, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 1719, 90 L.Ed.2d 69], the United States Supreme Court held that the exercise of peremptory challenges solely on the basis of a juror's race, or on the assumption that members of a racial group will not be able to consider the state's case impartially, violates the equal protection clause of the Fourteenth Amendment to the United States Constitution. Purposeful discrimination in the selection of the venire violates not only the rights of the prospective jurors, but also those of the criminal defendant who is a member of the same race. More recently the court held that the defendant need not be

of the same race to object to a prosecutor's race-based exercise of peremptory challenges. (*Powers* v. *Ohio* (1991) 499 U.S. 400, 415-416 [111 S.Ct. 1364, 1373, 113 L.Ed.2d 411].)

Appellant objected when Oxendine was challenged, asserting that the prosecutor was systematically excluding the only Black member of the panel. The court observed, and defense counsel agreed, that of the approximately 300 prospective jurors examined there had been no other Black jurors and, if there had been, the prosecution had not excused any. The court nonetheless offered the prosecutor the opportunity to explain the challenge. The prosecutor offered as his reason Oxendine's views on the death penalty.

The record supports the trial court's implicit finding that the prosecutor's explanation for the peremptory challenge to Oxendine was not pretextual. During that part of the voir dire addressed to her attitudes toward the death penalty, Oxendine stated that she disapproved of the death penalty because she would not want to put someone to death. She reconfirmed that view under subsequent questioning by the prosecutor. Although she said she could consider the death penalty in some cases, she immediately followed with her own question: "But why put a person to death. California isn't doing it."

A defendant who believes that peremptory challenges are being exercised on the basis of group bias alone must raise the point promptly, as appellant did here. The defendant must then make as complete a record as possible under the circumstances to establish a prima facie case of group bias, showing that the excluded persons are members of a group that is cognizable under the cross-section rule, and that from all of the circumstances a strong likelihood appears that group members are being challenged because of their group association. Only then does the burden shift to the People to provide a race-neutral explanation for the exercise of peremptory challenges. (*People* v. *Turner* (1994) 8 Cal.4th 137, 164-165 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

While the court here did offer the prosecutor the opportunity to explain the use of a peremptory challenge to remove Oxendine, it is not clear that the court found that appellant had established a prima facie case. On this record it is doubtful that the judge did so.[31] Assuming the court did so find, however, there was no error. We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons for the exercise from

---

[31]Contrary to appellant's assumption, in such a circumstance there is no impropriety in ruling on a *Wheeler*-based objection before the prosecutor explains the reason for exercising peremptory challenges. (*People* v. *Turner, supra,* 8 Cal.4th at pp. 164, 166-167.)

sham excuses. (*People* v. *Turner*, *supra*, 8 Cal.4th at p. 165.) The record here suggests grounds other than group bias on which the peremptory challenge could reasonably have been based—Oxendine's attitude toward the death penalty.

E. *Qualification of Jurors.*

Several prospective jurors were excused for cause, after challenge by the People, on the basis of attitudes about capital punishment that would prevent them from considering or imposing the death penalty. Appellant claims that the court erred in excusing Virginia Norton, one of those prospective jurors. He also claims that the court erred in refusing to excuse several prospective jurors whose pro-death-penalty attitudes reflected inability to fairly consider the alternative punishment—life imprisonment without possibility of parole.

We conclude that the court did not err in either respect.

1. *Witherspoon/Witt Error.*

 The state may not, in a capital trial, excuse all jurors who express conscientious objections to capital punishment. Doing so violates the defendant's Sixth Amendment-based right to an impartial jury and subjects the defendant to trial by a jury "uncommonly willing to condemn a man to die." (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521 [88 S.Ct. 1770, 1776, 20 L.Ed.2d 776], fn. omitted.) A juror may be excused, however, if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841], fn. omitted.) Because determination of juror bias is fact based and involves assessing the demeanor and credibility of the prospective juror, the question is one "peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; . . ." (*Id.* at p. 428 [105 S.Ct. at p. 854], fn. omitted.)

When applying these rules, the trial court's assessment of a prospective juror's state of mind will generally be binding on the reviewing court if the juror's responses are equivocal or conflicting. If there is no inconsistency, "the trial court's judgment will not be set aside if it is supported by substantial evidence." (*People* v. *Wash* (1993) 6 Cal.4th 215, 254 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

2. *Excusal of Norton.*

 Norton had served on a jury before. Her religious convictions made it difficult for her to judge other people. When asked how those feelings

would affect her in determining life and death, she replied: "To be truthful to you, I couldn't determine death." When counsel explored the topic further she stated she did not know if she was against the death penalty, but by herself she just could not impose it. She could not "[b]e responsible for giving the death penalty. To anyone. I just couldn't. I couldn't live with myself afterwards." She believed that there might be circumstances in which the death penalty was warranted, but she could not say that she could consider the death penalty "because I have to live with whatever decision I make." She doubted that she would vote for the death penalty even in a case in which she concluded that the evidence showed it to be the penalty justice would demand.

When asked if there was still a possibility that she could vote for the death penalty, Norton replied: "We don't any of us know exactly what we are going to do when we are faced with a situation, but the way I feel now, I just don't feel that I could ever do it." She conceded only that if after hearing the evidence she became angry enough she might, but she did not want to do through anger anything she would not want to do logically. Norton repeatedly said she did not know if she could impose the death penalty and that "[r]ight now I would say absolutely I would not vote for the death penalty." When pressed as to whether she would follow the court's instructions, Norton continued to express doubt that she could impose death. Finally, although she believed she could be a fair and impartial juror, Norton said that the way she felt then, "I will not condemn anyone to death." She then confirmed, when asked by the prosecutor, that regardless of the evidence she would not vote for death in any case.

Norton was not, as appellant asserts, ambivalent about whether she would ever vote to impose the death penalty. There was no inconsistency in her responses. The trial court's conclusion that her attitude toward imposition of the death penalty would substantially impair her ability to exercise her duties as a juror is supported by substantial evidence.

### 3. *Pro-death-penalty Bias.*

Appellant next claims that the voir dire of prospective jurors Ratliff, Blanco, Wolfe, Hamilton, Housewright, Jackson, and Lederle reflected such strong pro-death-penalty bias that they could not be fair. He argues that his failure to challenge some of these jurors for cause should be excused because the trial occurred before *Wainwright* v. *Witt, supra,* 469 U.S. 412, clarified the standard for excusing prospective jurors in capital cases. Under the then governing *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, standard, a juror could be excused only if the juror's attitude about the death penalty

made it unmistakably clear that the juror would automatically vote for or against the death penalty regardless of the nature of the aggravating and mitigating evidence.

Appellant did not challenge Ratliff, Wolfe, and Jackson for cause. He used peremptory challenges to excuse Ratliff, Blanco, Jackson, Housewright, Wolfe, and Lederle, and did not exhaust his peremptory challenges, using only 20 of the 26 peremptory challenges allotted to him. Hamilton's name was not called and thus she was never seated, and the need to exercise a peremptory challenge never arose.

Assuming that appellant did not waive any claim with respect to possible pro-death-penalty bias as to those prospective jurors not challenged (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]), he cannot demonstrate prejudice as to them or the jurors actually challenged. He had a sufficient number of peremptory challenges remaining to have excused them. (*People v. Price, supra,* 1 Cal.3d at p. 401.)

The claim lacks merit in any event. Our review of the voir dire of these prospective jurors about whom appellant now complains satisfies us that the court did not err in denying the challenges that were made and would not have erred had it denied challenges to the others.[32] None displayed such bias that he or she could not have been fair. Finally, appellant cannot demonstrate prejudice because none of these prospective jurors actually served as a juror or alternate juror.

F. *Cumulative Prejudice.*

Finally, appellant claims he was denied a fair trial by the cumulative impact of the multiple errors he has identified at the guilt and penalty phases of the trial.

Having concluded that no prejudicial error occurred, we reject this claim.

VI

DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Chin, J., and Brown, J., concurred.

---

[32]Ratliff, Blanco, Wolfe, Hamilton, Housewright, Jackson, and Lederle.

**MOSK, J.**—I dissent.

Royal Kenneth Hayes was charged by the People through the Santa Cruz District Attorney with, among other things, murdering Lauren de Laet and Donald MacVicar, and was alleged to have done so under the special circumstance of multiple murder. Trial was by jury in the Santa Cruz Superior Court. The court ruled inadmissible certain evidence about Hayes's criminal history, including this: He had committed two prior "murders" in Minnesota and Oregon, but had been acquitted of both, in Oregon on his successful plea of not guilty by reason of insanity; and he had been convicted of one or more firearm offenses under the law of the United States, and had been imprisoned therefor at the United States Penitentiary at Leavenworth. The court admonished the jurors not to read, watch, or listen to accounts in the press relating to the case. It also admonished them not to discuss it with others. Following trial of the issues of guilt and special circumstance, the jury found Hayes guilty of murdering de Laet and MacVicar under the special circumstance of multiple murder. Following trial of the issue of penalty, the jury deadlocked. The court declared a mistrial. The People elected to retry the penalty issue. On Hayes's motion for change of venue, the court transferred the case to the Stanislaus Superior Court for such proceedings. At their conclusion, a jury fixed the penalty for the murders at death. The court rendered judgment accordingly.

I

After the original trial of the issue of penalty in the Santa Cruz Superior Court and before retrial of the same issue in the Stanislaus Superior Court, Hayes moved the Santa Cruz Superior Court for a new trial of the issues of guilt and special circumstance on the ground of juror misconduct, including the improper receipt of evidence outside of court relating to the case.

Under section 1181 of the Penal Code, a defendant may move the trial court for an order for a new trial after an adverse verdict or finding on grounds including misconduct by one or more jurors (see *id.*, subds. 2, 3, & 4), including the improper receipt of evidence outside of court relating to the case (*id.*, subd. 2). He may support his motion by affidavits or declarations. (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Judgment and Attack in Trial Court, § 3078, p. 3802 [mentioning affidavits only]; see Code Civ. Proc., § 2015.5 [generally allowing declarations in place of affidavits].) Pursuant to *People* v. *Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260], the trial court may conduct an evidentiary hearing into juror misconduct, and may permit the parties to call jurors and compel them to testify, in order to resolve disputed issues of material fact, but may do so

only in the face of evidence demonstrating a strong possibility of juror misconduct that might have been prejudicial. (*Id.* at pp. 414-419.) A determination by a trial court to conduct, or not to conduct, an evidentiary hearing ancillary to ordering, or not ordering, a new trial is examined by a reviewing court under the standard of abuse of discretion. (See, e.g., *ibid.*) A ruling ordering, or not ordering, a new trial itself is scrutinized under the same test. (E.g., *People* v. *Clair* (1992) 2 Cal.4th 629, 667 [7 Cal.Rptr.2d 564, 828 P.2d 705].) A trial court abuses its discretion when its action falls outside the bounds of reason. (E.g., *People* v. *Kipp* (1998) 18 Cal.4th 349, 371 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

In his moving papers for a new trial, Hayes offered unsworn "affidavits" by his attorney, Jon C. Minsloff, and his attorney's investigator, Kevin Love.

In pertinent part, Defense Counsel Minsloff's "affidavit" was to this effect: After the Santa Cruz Superior Court declared a mistrial on the issue of penalty, Defense Investigator Love interviewed Nancy C. Wynn, who had been one of the jurors, and became aware that she and other jurors had misconducted themselves. Minsloff and Love together interviewed Juror Wynn a second time. Wynn confessed. She "admitted that she, herself, had read . . . stories which appeared in the Santa Cruz Sentinel *during* the course of the trial. She said it was too tempting not to want to read about the case. She said that she was, as a result of said article[s], familiar with . . . Hayes' prior criminal record, including his two previous trials for murder." (Emphasis in original.) Wynn "stated that it was obvious to her that . . . Norlene [*sic*: apparently for "Norleen"] Hawley," another one of the jurors, "was reading the same articles she was because of her timing after the articles appeared and the context of her comments during the guilt-phase deliberations," which referred to facts about Hayes that were not in evidence, such as: " 'You know he . . . met Jim Johnson' "—who was one of his associates—" 'in Leavenworth' " (which may or may not have been true); " 'He's . . . done it twice before, you know . . .' "; and, " 'This isn't the first time he's done it.' " Wynn "stated that she felt most of the jurors had been reading newspaper accounts of the trial, during the trial. She always saw . . . Ed Wagner," another one of the jurors, "carrying" a "copy of the San Jose Mercury during the trial. And based on Wagner's comments during deliberations she was sure he was reading articles about the case. Both Wagner and . . . Clarence Hedrick," another one of the jurors, "stated during the penalty phase, 'We've got to stop him now. We can't let him get away with it again.' " Wynn "further stated that . . . Harvey Solomon," who would become the jury foreperson, "had stated during the guilt-phase of the trial, that he had acquired a nick-name from his fellow teachers at school (during the Fridays when court was not in session) as a result of their

discussion about this case, that nick-name being 'Hang 'em High Harvey[.]'" Minsloff met at his office with Assistant District Attorney Madeleine Boriss, who prosecuted the trial in the Santa Cruz Superior Court, and "shared with her information" that he had "obtained as set forth" above. Prosecutor Boriss admitted that Wynn had confessed to her as well. Boriss "informed" Minsloff "that she too had interviewed . . . Wynn shortly after the trial . . . , and that . . . Wynn had related to her the same information about juror misconduct." Minsloff then "disclosed all of" his "investigation materials regarding juror misconduct . . . to District Attorney Arthur Danner, III," at a meeting at Danner's office. Sometime later, Assistant District Attorney Jon E. Hopkins, who would prosecute the retrial of the issue of penalty in the Stanislaus Superior Court, and his investigator, Dennis Clark, "spent approximately an hour with . . . Wynn, at her house, presumably in conversation about the alleged juror misconduct." Later still, Minsloff and Love "again visited with . . . Wynn . . . On that occasion . . . Wynn declared unequivocally that she would, under no circumstances, submit an affidavit regarding the matter she had previously discussed with" them "as set forth" above.

Defense Investigator Love's "affidavit" was similar in substance to Defense Counsel Minsloff's. It also contained additional information, such as the following: At Love's initial interview with Juror Wynn, Wynn "stated that she had spoken with" Prosecutor Boriss, and that "Boriss had told her that" Love "would probably try to get her to sign an Affidavit." Love "asked" Wynn "if she had any idea why . . . Boriss would assume that" he "would want her to sign an Affidavit." Wynn "stated that it was because of the conduct of the jury during the trial, and the fact that she felt that several of the jurors had been reading newspaper accounts of the case during the course of the trial." At the meeting at District Attorney Danner's office at which Minsloff disclosed all of his investigation materials regarding juror misconduct, Love and Boriss were also present, as well as Assistant District Attorney Joyce E. Angell. Boriss admitted that Wynn had confessed to her too. Boriss "stated that she had also spoken with . . . Wynn shortly after the trial and that . . . Wynn had admitted to her that she had read newspaper articles about the case during the course of the trial."

In his moving papers for a new trial, Hayes made plain why he offered Defense Counsel Minsloff's and Defense Investigator Love's "affidavits" relating Juror Wynn's hearsay statements, instead of calling Wynn herself and compelling her testimony: *People* v. *Scott* (1982) 129 Cal.App.3d 301 [180 Cal.Rptr. 891], which had recently been decided and was uniquely on point—and which we would subsequently disapprove in *Hedgecock*—barred such action; and, as he would later imply, "respect and consideration for

. . . Wynn" counseled against any attempt in avoidance. He argued that Wynn's hearsay statements came within the exception for declarations against interest and hence were not inadmissible. He effectively requested an evidentiary hearing in the matter by explicitly offering testimony by Minsloff and Love and also, if he were permitted, by Wynn herself.

In their papers in opposition to Hayes's new trial motion, the People argued that Juror Wynn's hearsay statements in Defense Counsel Minsloff's and Defense Investigator Love's "affidavits" were inadmissible as outside of any exception, including that for declarations against interest. They also offered a declaration by Juror Ida C. Murray, an affidavit by Juror Bonnie Brofft, and a declaration by Prosecutor Hopkins—but, surprisingly, nothing at all by Prosecutor Boriss, who had by now disappeared from the case.

In pertinent part, Juror Murray's declaration was to this effect: "During the trial, and from the very first day when" the Santa Cruz Superior Court "admonished" her "to shun publicity about the case," she "avoided all exposure to publicity about . . . Hayes on [sic: apparently for "or"] his trial." "Never once did" she "see or hear anyone refer in anyway [sic] to publicity about the case, or mention any matter pertaining to . . . Hayes that was not presented . . . in the courtroom." "Subsequent to the conclusion of the trial," she "came to learn things about . . . Hayes' background which were not presented . . . at trial, specifically his prior difficulties with the law in Oregon and Minnesota." She "never once heard these matters referred to in any way, by any juror, during the pendency of the case. The other jurors who were present when this news was imparted . . . expressed surprise . . . ." Jury Foreperson Solomon was never "referred to . . . as '[H]ang 'em [H]igh Harvey.' " Juror Wynn "never made any statement . . . indicating that she had any knowledge of the case or . . . Hayes' background, beyond what was admitted . . . in court." She added that Wynn "generally spent courtroom breaks by herself, and would not have been as able to comment on the extra-deliberation conversation of jurors as [Murray herself]. She did not, as a general rule, engage in casual conversation with the other . . . jurors or alternates."

Juror Brofft's affidavit was similar to Juror Murray's declaration: She "never, not once, heard any juror make any reference to publicity material or any information about the case or" Hayes "that was not presented . . . at trial." In fact, she "heard almost daily comment from" her "fellow jurors about the feeling of being 'out of touch' from not reading any newspaper or watching TV news, but no one to" her "knowledge expressed any unhappiness or resentment at this state of affairs." She "never heard the term 'Hang 'em High Harvey' used by any juror during the pendency of the trial."

Prosecutor Hopkins's declaration described what transpired at the meeting that he and Prosecution Investigator Clark had had with Juror Wynn: Wynn "stated . . . that she did not read any newspaper articles relating to . . . Hayes during the pendency of the trial." Asked whether "anything was said by any other juror that would lead her to believe that they had read newspaper articles or listened to other media coverage concerning the Hayes case," "she said that no one said that they had, but she assumed that they did because they all stuck together and the men were all so 'macho.' "

In his papers in reply to the People's opposition to his new trial motion, Hayes "concede[d]" that Defense Counsel Minsloff's and Defense Investigator Love's "affidavits" amounted to inadmissible hearsay outside of any exception—erroneously so, since a party is permitted to support a new trial motion by affidavits (6 Witkin & Epstein, Cal. Criminal Law, *supra*, Judgment and Attack in Trial Court, § 3078, p. 3802). But he again effectively requested an evidentiary hearing in the matter by explicitly offering testimony by Minsloff and Love and also, if he were permitted, by Juror Wynn herself.

The Santa Cruz Superior Court conducted a hearing on Hayes's new trial motion. After confirming that the court had "received," and presumably read, "all the moving papers," Hayes, through Defense Counsel Minsloff, "initially submit[ted] the issue on the basis of" such papers, which contained his two effective requests for an evidentiary hearing with their explicit offers of testimony by Minsloff and Defense Investigator Love and also, if he were permitted, by Juror Wynn herself. Through Prosecutor Hopkins, the People argued that the evidence that Hayes offered in order to show prejudicial juror misconduct consisted solely of inadmissible hearsay statements not within any exception. They conceded, in Hopkins's words, that Wynn "told the defense one thing"—which, if true, would establish what they expressly acknowledged to be prejudicial juror misconduct, at least by her—and that she "told the prosecution, me and [Prosecution Investigator] Clark, a totally different thing"—which, if true, would preclude juror misconduct of any kind, if only on her part. In so conceding, they acknowledged that Wynn's credibility was dispositive, but assumed that *Scott*'s bar against calling her and compelling her testimony was unavoidable, stating, to quote Hopkins, that "I think it would be a totally different matter if we were entitled to bring a juror and put them on the stand and I agree with the rationale that we can't, but if we actually had someone in front of us and the Court had an opportunity to evaluate their credibility and demeanor, whether misconduct had actually occurred, it would be a different matter." The court effectively accepted the People's concession that Wynn both confessed prejudicial juror misconduct and also denied any such misconduct at all. It explicitly joined in

their acknowledgment that Wynn's credibility was dispositive: Wynn's "credibility is very much in issue, perhaps not the fact that she made" the statements reported, "but the question of whether" such statements were "true or not . . . ." But, without proceeding further, it denied the motion. It reasoned, in substance, that the evidence that Hayes offered in order to show prejudicial juror misconduct consisted solely of inadmissible hearsay statements not within any exception, and hence did not constitute "admissible content [*sic*: apparently for "competent"] evidence" of such a violation.

## II

In my view, the Santa Cruz Superior Court erred by failing to conduct any further proceedings whatsoever on Hayes's new trial motion relating to prejudicial juror misconduct in the form of the improper receipt, at least by Juror Wynn, of evidence outside of court about his criminal history. Its omission was altogether unreasonable.

To begin with, the Santa Cruz Superior Court had before it *evidence* demonstrating a strong possibility of prejudicial juror misconduct requiring the resolution of disputed issues of material fact. Perhaps more precisely, it had *more than evidence*. The People's concession that Juror Wynn both confessed prejudicial juror misconduct and also denied any such misconduct at all amounted to a judicial admission. "Such a judicial admission" " 'is not merely evidence of a fact; it is a conclusive concession of the truth of a matter which has the effect of removing it from the issues.' " (*Smith* v. *Walter E. Heller & Co.* (1978) 82 Cal.App.3d 259, 269 [147 Cal.Rptr. 1].) The People's concession was corroborated by an "adoptive admission," as it were, on their part. As noted, Hayes offered "affidavits" by Defense Counsel Minsloff and Defense Investigator Love. Minsloff and Love each stated that Prosecutor Boriss had admitted *to him* that Wynn had confessed *to her*, as indicated. As also noted, the People did not offer anything at all by Boriss. One would reasonably have expected them to do so if Boriss believed Minsloff's and Love's statements to be false. Apparently, she did not.

Next, the Santa Cruz Superior Court had before it evidence *demonstrating a strong possibility of prejudicial juror misconduct* requiring the resolution of disputed issues of material fact.

The court in *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985] recognized that it is misconduct for a juror improperly to receive evidence outside of court relating to the case. (*Id.* at p. 647.)

The *Carpenter* court also recognized that juror misconduct of this sort "gives rise to a presumption of prejudice" as a matter of law. (*In re*

*Carpenter, supra,* 9 Cal.4th at p. 651.) That means, of course, that the People "must then rebut the presumption or lose the verdict." (*People* v. *Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676]; accord, e.g., *People* v. *Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127]; *In re Stankewitz* (1985) 40 Cal.3d 391, 402 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].)

Without casting its language to take account of the *presumption* of prejudice, the *Carpenter* court went on to "summarize" the law relating to *prejudice* itself: "[W]hen [juror] misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant." (*In re Carpenter, supra,* 9 Cal.4th at p. 653.)

With this language recast to take account of the *presumption* of prejudice, the "summary" reads thus: "When juror misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record. The verdict will be set aside unless there appears no substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias unless the extraneous material, judged objectively, is not inherently and substantially likely to have influenced the juror. Second, looking to the nature of the misconduct and the surrounding circumstances, we will also find bias unless it is not substantially likely the juror was actually biased against the defendant."

Here, there exists a strong possibility of prejudicial juror misconduct in the form of the improper receipt, at least by Juror Wynn, of evidence outside of court about Hayes's criminal history.

As for juror misconduct: The People's concession that Juror Wynn both confessed prejudicial juror misconduct and also denied any such misconduct at all is sufficient.

As for prejudice: A presumption of prejudice arises as a matter of law. It does not show itself to be rebutted as a matter of fact. That is because we cannot say that there is no substantial likelihood of juror bias.

First, we cannot declare that the out-of-court evidence improperly received here, namely, that Hayes had committed, but had been acquitted of, two prior "murders," judged objectively, is not inherently and substantially likely to have influenced a juror. In *People* v. *Holloway* (1990) 50 Cal.3d 1098 [269 Cal.Rptr. 530, 790 P.2d 1327], which the *Carpenter* court cited with approval, we could not dismiss the threat of taint posed by out-of-court evidence that, on a single previous occasion, Holloway had *not* gotten away with assault with a deadly weapon. Here, a fortiori, we cannot dismiss the threat of taint posed by out-of-court evidence that, on two previous occasions, Hayes had, in fact, gotten away with murder. True, the evidence against Hayes in this case may be considered to have been relatively strong. But, at the same time, it must be deemed to have been relatively weak, coming as it did largely from the mouths of two witnesses, one an accomplice as a matter of law, the other an accomplice at least as a matter of fact. In *Carpenter* itself, of course, the court dismissed the threat of taint posed by out-of-court evidence that Carpenter had committed, and been convicted of, two prior murders. There, however, evidence had properly been admitted that Carpenter had in fact committed the murders in question. Here, by contrast, no evidence had been admitted, properly or otherwise, relating in any way to either of Hayes's two prior "murders."

Second, looking to the nature of the misconduct and the surrounding circumstances, we cannot say that it is not substantially likely that any juror was actually biased against Hayes. Recall Juror Wynn's report of the statement of Jurors Wagner and Hedrick: "We've got to stop him now. We can't let him get away with it again." In *In re Hitchings* (1993) 6 Cal.4th 97 [24 Cal.Rptr.2d 74, 860 P.2d 466], which the *Carpenter* court also cited with approval, we were unable to deny the danger of partiality against Hitchings as revealed by the words of a single juror. Here, a fortiori, we cannot deny the danger of partiality against Hayes as revealed by the words of two. It may well be that an unbiased jury would have reached the same verdict. Nevertheless, as the *Carpenter* court concluded, "we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict. [Citation.] A biased adjudicator is one of the few 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.' " (*In re Carpenter, supra,* 9 Cal.4th at p. 654, quoting *Arizona* v. *Fulminante* (1991) 499 U.S. 279, 309 [111 S.Ct. 1246, 1265, 113 L.Ed.2d 302].)

Lastly, the Santa Cruz Superior Court had before it evidence demonstrating a strong possibility of prejudicial juror misconduct *requiring the resolution of disputed issues of material fact.* Such issues were patent. They went to Juror Wynn's credibility: Should she be believed in her confession of prejudicial juror misconduct? Or should she be believed in her denial thereof?

In view of the foregoing, the Santa Cruz Superior Court erred by failing to conduct any further proceedings whatsoever on Hayes's new trial motion relating to prejudicial juror misconduct. The court should have held a hearing to take evidence in order to resolve the disputed issues of material fact referred to above in the face of evidence demonstrating a strong possibility of prejudicial juror misconduct, or, at the very least, should have held a hearing of some sort in order to determine whether it could properly decline to take evidence for that purpose. Because it erred by failing to conduct any further proceedings whatsoever, it necessarily erred by denying the motion, as it did, prematurely.

## III

In concluding that the Santa Cruz Superior Court did not err by failing to conduct any further proceedings whatsoever on Hayes's new trial motion relating to prejudicial juror misconduct, the majority state a variety of reasons. No single one, however, yields the result that they desire. Neither do all of them together.

To salvage the Santa Cruz Superior Court's ruling, the majority essentially fault Hayes.

Generally, the majority claim that Hayes "failed to present substantial competent evidence of jur[or] misconduct." (Maj. opn., *ante*, at p. 1252.) Any such failure, of course, became immaterial in light of the People's concession that Juror Wynn both confessed prejudicial juror misconduct and also denied any such misconduct at all. The majority assert that I maintain that the People's concession "remov[ed] the issue of whether juror misconduct occurred from the case." (*Id.* at p. 1258.) I do no such thing. The People's concession *raised* the issue—for whose *resolution*, as the Santa Cruz Superior Court itself acknowledged, Wynn's credibility was dispositive.

More specifically, the majority charge Hayes with not arguing the motion before the Santa Cruz Superior Court other than by submitting it on his moving papers. But he did in fact do so, and in any event was not required to speak what he had already written. They charge him with not offering any evidence other than inadmissible hearsay statements not within any exception. But he did in fact do so, by offering facts within the personal knowledge of Defense Counsel Minsloff and Defense Investigator Love. They charge him with not requesting an evidentiary hearing. But he did in fact do so, in effect if not in terms, by offering testimony by Minsloff and Love and also, if he were permitted, by Juror Wynn herself, and by offering such

testimony explicitly. To assert that "[w]hether an evidentiary hearing should be held never arose" (maj. opn., *ante*, at p. 1259) is to overlook the fact that the question was raised by the court itself, in its acknowledgment that Wynn's credibility was dispositive. They charge him with not calling Wynn and compelling her testimony. True, he did not, but he not improperly abided by *Scott*, whose bar against such action was then treated by Witkin and Epstein themselves as black letter law (6 Witkin & Epstein, Cal. Criminal Law, *supra*, Judgment and Attack in Trial Court, § 3081, p. 3805), and he properly did not attempt to do otherwise "out of respect and consideration for . . . Wynn," manifestly taking steps to preclude even the appearance of "improperly intrusive conduct" (*In re Hamilton* (1999) 20 Cal.4th 273, 303, fn. 23 [84 Cal.Rptr.2d 403, 975 P.2d 600]; accord, *Townsel* v. *Superior Court* (1999) 20 Cal.4th 1084, 1092 [86 Cal.Rptr.2d 602, 979 P.2d 963]). They charge him with not offering the testimony in question yet again after the court denied his motion. True, he did not, but he was not compelled to press for an express refusal after receiving an implied one. They charge him with not obtaining a ruling whether the court would permit him to call Wynn and compel her testimony. But he did in fact do so, impliedly if not expressly, by obtaining a denial of his motion which sought such permission.

To salvage the Santa Cruz Superior Court's ruling, the majority also excuse the court itself.

Generally, the majority claim that the Santa Cruz Superior Court "had no reason to even consider" conducting further proceedings. (Maj. opn., *ante*, at p. 1253.) Of course it did. Indeed, it stated the reason itself, in its acknowledgment that Juror Wynn's credibility was dispositive, but unresolved.

More specifically, the majority say that the immediate formal question before the Santa Cruz Superior Court was whether Juror Wynn's statements were inadmissible hearsay not within any exception. They are silent, however, about the fact that the ultimate substantive question was whether she and perhaps others engaged in prejudicial juror misconduct. They say that, whereas the evidence that Hayes offered in order to show prejudicial juror misconduct was inadmissible, the evidence that the People offered in order to show no such misconduct at all was, by contrast, altogether admissible. They are silent, however, about the fact that Hayes's evidence and the People's were not dissimilar—if the People's evidence was admissible, so also was Hayes's. They say, or at least do not deny, that there was no dispute about what Wynn stated to the People's representatives and to Hayes's after trial. They are silent, however, about the fact that there was indeed a dispute about what she *did during trial*, namely, whether she engaged in prejudicial juror misconduct or in no such misconduct at all. They say that the law was

then not as *Scott* stated it to be, barring a party from calling a juror and compelling his testimony. They are silent, however, about the fact that Witkin and Epstein themselves treated *Scott*'s bar as black letter law—to assert, now, that "contrary authority" existed (maj. opn., *ante*, at p. 1259) is not enough, for "contrary authority" of some sort always exists. They say that there is no indication that the court believed itself bound by *Scott*, as Witkin and Epstein themselves declared that it was, not to permit Hayes to call Wynn and compel her testimony. They are silent, however, about the fact that, whatever its belief, it did not permit him to do so—unreasonably, in view of the People's concession that Wynn both confessed prejudicial juror misconduct and also denied any such misconduct at all, and its own acknowledgment that her credibility was dispositive. They say that there was no basis to conclude that further proceedings would have been productive. They are silent, however, about the fact that such proceedings would have resolved the question once and for all, and would thereby have rendered unnecessary the invitation that they find themselves compelled to extend today, some 14 years later, to reopen the issue by petition for writ of habeas corpus. They say that this case is similar to *People* v. *Cox* (1991) 53 Cal.3d 618 [280 Cal.Rptr. 692, 809 P.2d 351]. They are silent, however, about the fact that *Cox* did not involve a concession, like the People's, or an acknowledgment, like the court's, and is distinguishable on that ground alone.

## IV

Having found error on the part of the Santa Cruz Superior Court by failing to conduct any further proceedings whatsoever on Hayes's new trial motion relating to prejudicial juror misconduct, I turn now to consider its consequences.

Because the error concerned only a failure to conduct further proceedings relating to prejudicial juror misconduct, and not prejudicial juror misconduct itself, we should not reverse the judgment outright. Indeed, we may not do so under the harmless error rule of section 13 of article VI of the California Constitution, which prohibits us from taking such action except in the presence of a "miscarriage of justice."

But, because the error did in fact concern a failure to conduct further proceedings relating to prejudicial juror misconduct, and thereby resulted in an absence of evidence regarding its actual existence or nonexistence, we should vacate the judgment and remand the cause to the Santa Cruz Superior Court with directions to do what it omitted and act in accordance with what transpires, including ordering a new trial if it finds prejudicial juror misconduct and transferring the matter to the Stanislaus Superior Court for reinstatement of the judgment if it does not. Indeed, we must do so. Otherwise,

the error in question would render itself harmless per se, inasmuch as it necessarily results in an absence of evidence of any miscarriage of justice that it might have brought about.

## V

For the reasons stated above, I would therefore vacate the judgment and remand the cause to the Santa Cruz Superior Court for proceedings not inconsistent with the views expressed herein.

Kennard, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied February 16, 2000, and the opinion was modified to read as printed above. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.